The State ex rel. Lamb vs. Cunningham, Secretary of State.

THE STATE EX REL. LAMB VS. CUNNINGHAM, Secretary of State.

*September 22 — September 27, 1892.*

CONSTITUTIONAL LAW: SUPREME COURT: APPORTIONMENT. (*1*) *Injunction: Jurisdiction when attorney general refuses to bring suit.* (*2*) *Validity of apportionment act a judicial question.* (*3–8*) *Constitutional requirements: Census: Former violations irrelevant: Equality of representation: Compactness may yield to equality: Inequalities in act of July, 1892.*

1. The power of the supreme court, under sec. 3, art. VII, Const., to issue its writ of injunction is in no way dependent upon the volition of the attorney general; and his refusal to bring the suit or to consent thereto will not prevent the court from taking jurisdiction upon the relation of a private citizen in the name of the state.

2. In an action to enjoin the secretary of state from giving notices of an election of members of the legislature under an apportionment act alleged to be in violation of the constitution, the question as to the validity of such act is a *judicial* and not a political question.

3. Under sec. 3, art. IV, Const., an apportionment must be made "according to the number of inhabitants" as shown by the last previous federal or state census; and the legislature may not act upon the theory that certain counties contain more or fewer inhabitants than such census shows; nor can the standard of population be disregarded and the apportionment be based upon considerations as to the wealth of certain localities, the character of their population and business interests, or differences in the rapidity of the increase of population.

4. The question being as to the validity of an apportionment act, the fact that the inequality of representation under it is no greater than under former apportionment acts is irrelevant, the language of the constitution securing equality being plain and unambiguous.

5. Under sec. 3, art. IV, Const., providing that the legislature "shall apportion and district anew the members of the senate and assembly according to the number of inhabitants," the districts must be as nearly equal in population as other constitutional requirements will permit. *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440, reaffirmed.

6. This rule, securing equality of representation so far as it is practically attainable without violating other constitutional provisions, is

The State ex rel. Lamb vs. Cunningham, Secretary of State.

applicable not only in the formation of an assembly district out of two or more counties, but also in the formation of two or more assembly districts in one county, there being in the latter case necessarily a new unit of representation.

7. The requirement of sec. 4, art. IV, Const., that assembly districts shall "be in as compact form as practicable," being of lesser importance, may to some extent yield in aid of securing a nearer approach to equality of representation.

8. The unnecessary inequalities under the apportionment act of July, 1892,— such, for example, as the formation of six assembly districts, each containing one or more counties, with an aggregate population less than four times the unit of representation, when such counties might have been grouped into four districts; a difference of over 7,000 in population between assembly districts in a county, when they might have been formed with a difference not exceeding 1,000 and with a gain in compactness; and the formation of one senate district from two assembly districts with a population of 30,732, and of another senate district from four assembly districts with a population of 65,952,— are *held* to render the act invalid.

WINSLOW, J., dissents.

This action was commenced in this court for the purpose of perpetually enjoining and restraining the defendant, as secretary of state, and his successors in office, from publishing and continuing to publish a copy of the notices of election of members of the senate and assembly in a newspaper printed in Madison, once in each week from the date of such notice until the general election, describing the several legislative districts in such notice the same as attempted to be created by the act of July 2, 1892, and also from filing and preserving in his office certificates of nomination and nomination papers, and from certifying to the several county clerks in the state the names and descriptions of the persons nominated for such legislative offices as specified in such certificates of nomination, and for other relief.

The complaint, in effect, alleges the census of 1890 in the state and the several counties, towns, and wards in the

state, and in the several senate and assembly districts so
attempted to be created by said act of July 2, 1892, as will
more particularly appear from Exhibits A and B, showing
such senate and assembly districts and the population, an-
nexed; and also alleging that the assembly unit under said
census was 16,868, and for the senate district 51,117; and
alleging the several provisions of said act, wherein it is
claimed that the same were in violation of the constitution
of this state, and particularly as to the 9th, 10th, 12th,
14th, 17th, 20th, 27th, 29th, and 31st senate districts; and
also alleging, in effect, that more than one half of the as-
sembly districts of the state, as formed by said act, had
been so formed in disregard and in gross violation of the
constitutional requirements; and alleging facts particularly
as to the following assembly districts:  The one composed
of Florence, Forest, and Oneida counties, containing only
8,626 inhabitants; the one composed of Langlade county,
with only a population of 9,465; the one composed of Price
and Taylor counties, with a population of only 11,989; the
one composed of the city of Janesville, with a population of
only 10,836; while other districts therein alleged contain
very much more than the unit of population.  It is also al-
leged therein that in several of the counties of the state en-
titled to more than one member of assembly the said act
attempts to create the assembly districts therein without re-
gard to substantial equality of representation in proportion
to population as between said districts, and so that they do
not consist of contiguous territory and are not in as compact
form as practicable, where conformity to the constitutional
requirement in that behalf would also secure said equality
of representation as between said districts; and particu-
larly points out such discrepancies in respect to the coun-
ties of Columbia, Brown, Grant, Rock, Racine, Walworth,
Waupaca, Eau Claire, Chippewa, La Crosse, Waukesha,
Sheboygan, Outagamie, Dane, Winnebago, Marathon, and

The State ex rel. Lamb vs. Cunningham, Secretary of State.

Fond du Lac. That Vernon, with a population of 25,111, was entitled to two members.

It appears from the record that August 1, 1892, the said relator, as a citizen of Dane county, applied to the attorney general of the state to move in this court for leave to bring an action in the name of the state against the said secretary to enjoin him from carrying into execution the said act of July 2, 1892, on the ground of the unconstitutionality of the same, and at the same time presented to him a petition setting forth substantially the facts so alleged in said complaint. August 5, 1892, the said relator served upon the attorney general a proposed complaint in such action, alleging substantially the matters contained in the complaint herein, and requesting him to commence the same. August 9, 1892, and on notice to the attorney general, the said relator applied to this court for leave to commence and prosecute such action. Thereupon the attorney general appeared in this court and made a statement respecting the same, and among other things said, in effect, that he had not, and did not then, refuse to bring said action nor refuse to ask leave to bring it; and asked further time to investigate the questions involved in said petition, so as to enable him intelligently to determine what course he should pursue; and that he was forced to ask for such further time by reason of the excessive duties of his office and circumstances over which he could have no control. Thereupon the court ordered, in effect, that unless the attorney general commenced such action before August 19, 1892, leave to commence which was thereby granted; the said petitioner and relator herein had leave to commence and prosecute the same in this court in the name of the attorney general, on giving bond to the state in the sum of $500, to be approved by a justice of this court, to indemnify the state against the costs of the action; and further ordered that in either case the secretary of state may an-

The State ex rel. Lamb vs. Cunningham, Secretary of State.

swer to the complaint within twenty days after the same should be so served upon him. August 18, 1892, the said attorney general filed in this court a paper to the effect that he deemed it his duty to decline to commence said suit in this court to test the validity of the said act of July 2, 1892, upon the relation of said petitioner or otherwise, and therein expressly refused his "consent to have such suit brought or conducted in the name of" his office as attorney general. Thereupon, and on August 19, 1892, the said relator filed the bond, duly approved by a justice of this court, as required by the order mentioned, and served the summons and said complaint in this action upon the defendant.

On September 8, 1892, the defendant demurred to the complaint on the grounds: (1) "That the court has no jurisdiction of the subject of the action; (2) that the plaintiff has not legal capacity to sue, in this, that the said relator has not the right to sue in the name of the state upon the alleged cause, of action; (3) that there is a defect of parties, in that the attorney general of the state of Wisconsin is the officer required by law to prosecute the action aforesaid, and no cause of action is shown to exist in favor of the said relator." On the same day the attorney general, for the defendant, served upon the attorney for the relator a notice to the effect: "Please take notice that on Tuesday, the 20th day of September, inst., at the opening of the court on that day, or as soon thereafter as counsel can be heard, the above-named defendant, by the undersigned, his attorney, will move the said supreme court, at the supreme court room in the capitol at Madison, for an order vacating and setting aside the order of said court granted *ex parte* on the 9th day of August, 1892, giving leave to the said relator to commence and prosecute this action,— reference being had thereto for its terms,— and dismissing this action, and for such other or further order as may be proper;

The State ex rel. Lamb vs. Cunningham, Secretary of State.

and also to vacate and set aside said order of August 9, 1892, giving the relator leave to commence and prosecute this action, and to dismiss the same." On September 8, 1892, the plaintiff served notice upon the attorney for the defendant to the effect that said relator would apply to this court on September 13, 1892, at the opening of the court on that day, or as soon thereafter as counsel could be heard, for an order striking out as frivolous the said demurrer of the defendant herein, and directing judgment in favor of the plaintiff as prayed for in said complaint. On September 9, 1892, the court set down said motions, respectively, and said demurrer, for full argument and consideration on the merits, for September 20, 1892, and the same were thereupon argued accordingly.

On September 27, 1892, the court (WINSLOW, J., dissenting) entered the following order and directions, to wit:

*By the Court.*— The court holds that the order granting leave to the relator to bring this action on behalf of the state was properly made, and the court has jurisdiction of the action in its present form; hence the motion on behalf of defendant to vacate the same, and dismiss the action, must be denied. The court further holds that the complaint states facts sufficient to entitle the state to the relief demanded therein; hence the motion on behalf of the state to strike out the demurrer to the complaint as frivolous, and for judgment, must be granted. Such determination of these motions in effect overrules the demurrer to the complaint. An opinion will be prepared and filed at an early day. If the defendant desires leave to interpose an answer to the complaint the court will hear a motion for such leave on the next motion day.

On September 30, 1892, the defendant's attorney presented to the court a proposed answer to said complaint.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

Upon considering the same, and on October 1, 1892, the court denied the motion to interpose such answer, and thereupon judgment was directed and entered according to the prayer of the complaint.

The following are Exhibits A and B, mentioned and referred to in said complaint:

### EXHIBIT A.

SENATE DISTRICTS, WITH POPULATION, AS CREATED BY CHAPTER 1, EXTRA SESSION OF 1892.

*Unit of Representation, 51,117.*

FIRST.— Door county, 15,682; Kewaunee county, 16,153; Marinette county, 20,304.

Total, 52,139. *Excess,* 1,022.

SECOND.— Brown county, 39,164, less 723 Indians, leaving 38,441; Oconto county, 15,009.

Total, 53,450. *Excess,* 2,333.

THIRD.— Racine county, 36,268; Kenosha county, 15,581.

Total, 51,849. *Excess,* 732.

FOURTH.— Milwaukee: First ward, 9,341; Third ward, 6,823; Seventh ward, 6,645; Eighteenth ward, 7,923.

Total, 30,732. *Less,* 20,385.

FIFTH.— Milwaukee: Fourth ward, 10,291; Fifth ward, 10,168; Eighth ward, 14,236; Fifteenth ward, 9,447; Sixteenth ward, 6,521.

Total, 50,663. *Less,* 454.

SIXTH.— Milwaukee: Second ward, 10,685; Sixth ward, 13,020; Ninth ward, 22,469.

Total, 46,174. *Less,* 4,943.

SEVENTH.— Milwaukee: Tenth ward, 19,879; Thirteenth ward, 14,658. Towns in Milwaukee county: Milwaukee, 6,403; Granville, 2,272; Wauwatosa, 10,914.

Total, 54,126. *Excess,* 3,009.

EIGHTH.— Milwaukee: Eleventh ward, 13,538; Twelfth ward, 11,791; Fourteenth ward, 11,337; Seventeenth ward, 5,696. Towns in Milwaukee county: Lake, 4,899; Oak Creek, 2,087; Franklin, 1,868; Greenfield, 3,190.

Total, 54,406. *Excess,* 3,289.

NINTH.— Adams county, 6,889; Green Lake county, 15,163; Juneau county, 17,121; Marquette county, 9,676; Waushara county, 13,507.

Total, 62,356. *Excess,* 11,239.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

TENTH.— Pierce county, 20,385; Burnett county, 4,393; Polk county, 12,968; St. Croix county, 22,397.

Total, 60,143. *Excess, 9,026.*

ELEVENTH.— Ashland county, 20,063; Bayfield county, 7,390; Douglas county, 13,468; Sawyer county, 1,977; Washburn county, 2,926.

Total, 45,824. *Less, 5,293.*

TWELFTH.— Lincoln county, 12,008; Marathon county, 30,369.

Total, 42,377. *Less, 8,740.*

THIRTEENTH.— Dodge county, 44,984. Towns in Columbia county: Scott, 824; Randolph, 974; Courtland, 1,245; Springvale, 703; Wyocena, 1,303; West Point, 701; Lodi, 1,375; Arlington, 828; Leeds, 1,171; Otsego, 1,127; Hampden, 861; Fountain Prairie, 1,315; Columbus, 800. Rio village, 339; Randolph village, West ward, 79; Columbus city, 1,977.

Total, 60,606. *Excess, 9,489.*

FOURTEENTH.— Florence county, 2,604; Forest county, 1,012; Langlade county, 9,465; Oneida county, 5,010; Shawano county, 19,236.

Total, 37,327. *Less, 13,790.*

FIFTEENTH.— Calumet county, 16,639; Manitowoc county, 37,831.

Total, 54,470. *Excess, 3,353.*

SIXTEENTH.— Crawford county, 15,987; Richland county, 19,121. Towns in Grant county: Beetown, 1,257; Bloomington, 1,174; Boscobel, 1,692; Castle Rock, 681; Ellenboro, 814; Fennimore, 1,423; Glen Haven, 883; Hickory Grove, 798; Lancaster, 3,289; Little Grant, 668; Marion, 573; Muscoda, 1,160; Mt. Hope, 640; Mt. Ida, 779; Millville, 197; Patch Grove, 690; Waterstown, 488; Woodman, 495; Wyalusing, 786; Wingville, 1,380.

Total, 54,975. *Excess, 3,858.*

SEVENTEENTH.— Green county, 22,732; Rock county, 43,220.

Total, 65,952. *Excess, 14,835.*

EIGHTEENTH.— Fond du Lac county, 44,088. *Less, 7,029.*

NINETEENTH.— Winnebago county, 50,097. *Less, 1,020.*

TWENTIETH.— Sheboygan county, 42,489. *Less, 8,628.*

TWENTY-FIRST.— Portage county, 24,798; Wood county, 18,127. Towns in Waupaca county: Matteson, 860; Larabee, incl. Clintonville city, 2,902; Dupont, 1,386; Helvetia, 516; St. Lawrence, 999; Waupaca, 964; Lind, 1,016; Dayton, 852; Farmington, 1,087; Scandinavia, 1,142; Iola, 1,315; Harrison, ——; Wyoming, ——. Waupaca city, 2,127.

Total, 58,091. *Excess, 6,974.*

TWENTY-SECOND.— Outagamie county, 38,690. Towns in Waupaca county: Union, 1,153; Bear Creek, incl. Lebanon, 2,068; Little Wolf, 1,487; Royalton, 1,198; Mukwa, 1,040; Caledonia, incl. Fre-

The State ex rel. Lamb vs. Cunningham, Secretary of State.

mont, 1,748; Weyauwega, incl. village, 1,252; Fremont village, incl. in Caledonia, ——. New London city: First ward, 515; Second ward, 338; Fourth ward, 485; Fifth ward, 344.

Total, 50,318. *Less,* 799.

TWENTY-THIRD.— Jefferson county, 33,530. Towns in Dane county: Albion, 1,516; Bristol, 1,129; Christiana, 2,379: Cottage Grove, 1,305; Deerfield, 1,573; Medina, 1,393; Sun Prairie, 912; York, 963; Sun Prairie village, 704.

Total, 45,404. *Less,* 5,713.

TWENTY-FOURTH.— Walworth county, 27,860. Towns in Waukesha county: Delafield, 1,684; Eagle, 1,020; Genesee, 1,327; Summit, 1,130; Muskego, 1,390; Vernon, 1,277; Ottawa, 880; Mukwanago, 1,217; Waukesha, 7,480.

Total, 45,265. *Less,* 5,852.

TWENTY-FIFTH.— Clark county, 17,708; Eau Claire county, 30,673.

Total, 48,381. *Less,* 2,736.

TWENTY-SIXTH.— Towns in Dane county: Blooming Grove, 999; Fitchburg, 958; Madison, 919; Madison city, 13,426; Burke, 1,093; Windsor, 1,329; Vienna, 1,009; Westport, 1,893; Dane, 1,161; Springfield, 1,111; Berry, 1,003; Roxbury, 1,073; Mazomanie, 1,482; Black Earth, 742; Vermont, 892; Cross Plains, 1,103; Middleton, 1,433; Blue Mounds, 1,449; Springdale, 1,120; Verona, 1,225; Dunkirk, 1,406; Dunn, 1,113; Pleasant Springs, 1,501; Rutland, 1,222; Oregon, 1,436; Montrose, 1,251; Primrose, 889; Perry, 996; Stoughton, 2,470.

Total, 47,704. *Less,* 3,413.

TWENTY-SEVENTH.— Sauk county, 30,575. Towns in Columbia county: Newport, incl. Kilbourn city, 1,448; Lewiston, 936; Ft. Winnebago, 646; Marcellon, 845; Caledonia, 1,336; Pacific, 255; Dekorra, 1,386; Lowville, 733. Portage city, 5,143.

Total, 43,303. *Less,* 7,814.

TWENTY-EIGHTH.— Iowa county, 22,117; La Fayette county, 20,265. Towns in Grant county: Cassville, 1,455; Clifton, 1,074; Harrison, 1,020; Hazel Green, 1,549; Jamestown, 961; Liberty, 881; Lima, 1,040: Paris, 778; Platteville, 3,687; Potosi, 2,110; Smelser, 1,295; Waterloo, 934.

Total, 59,166. *Excess,* 8,049.

TWENTY-NINTH.— Buffalo county, 15,997; Dunn county, 22,664; Barron county, 15,416; Pepin county, 6,932.

Total, 61,009. *Excess,* 9,892.

THIRTIETH.— Chippewa county, 25,143; Price county, 5,258; Taylor county, 6,731.

Total, 37,132. *Less,* 13,985.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

THIRTY-FIRST.— Jackson county, 15,797; Monroe county, 23,211; Vernon county, 25,111.

Total, 64,119.   *Excess,* 13,002.

THIRTY-SECOND.— La Crosse county, 38,801; Trempealeau county, 18,920.

Total, 57,721.   *Excess,* 6,604.

THIRTY-THIRD.— Ozaukee county, 14,943; Washington county, 22,751. Towns in Waukesha county: Brookfield, 1,960; Menominee, 2,480; New Berlin, 1,519; Pewaukee, 2,757; Lisbon, 1,443; Merton, 1,604; Oconomowoc city, 2,729; Oconomowoc town, 1,373.

Total, 53,559.   *Excess,* 2,442.

## EXHIBIT B.

ASSEMBLY  DISTRICTS — STATE  OF  WISCONSIN — APPORTIONMENT  OF 1892.

*Unit of Representation, 16,868.*

1.— Kenosha county, 15,581.   *Less,* 1,287.
2.— Green county, 22,732.   *Excess,* 5,864.
3.— La Fayette county, 20,265.   *Excess,* 3,397.
4.— Iowa county, 22,117.   *Excess,* 5,249.
5.— Ozaukee county, 14,943.   *Less,* 1,925.
6.— Washington county, 22,751.   *Excess,* 5,883.
7.— Richland county, 19,121.   *Excess,* 2,253.
8.— Vernon county, 25,111.   *Excess,* 8,243.
9.— Monroe county, 23,211.   *Excess,* 6,343.
10.— Juneau county, 17,121.   *Excess,* 253.
11.— Crawford county, 15,987.   *Less,* 881.
12.— Calumet county, 16,639.   *Less,* 229.
13.— Kewaunee county, 16,153.   *Less,* 715.
14.— Door county, 15,682.   *Less,* 1,186.
15.— Portage county, 24,789.   *Excess,* 7,921.
16.— Wood county, 18,127.   *Excess,* 1,259.
17.— Jackson county, 15,797.   *Less,* 1,071.
18.— Trempealeau county, 18,920.   *Excess,* 2,052.
19.— Pierce county, 20,385.   *Excess,* 3,517.
20.— St. Croix county, 22,397.   *Excess,* 5,529.
21.— Dunn county, 22,664.   *Excess,* 5,796.
22.— Clark county, 17,708.   *Excess,* 840.
23.— Shawano county, 19,236.   *Excess,* 2,368.
24.— Oconto county, 15,009.   *Less,* 1,859.
25.— Marinette county, 20,304.   *Excess,* 3,436.
26.— Barron county, 15,416.   *Less,* 1,452.
27.— Ashland county, 20,063.   *Excess,* 3,195.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

28.— Langlade county, 9,465.  *Less,* 7,403.
29.— Lincoln county, 12,008.  *Less,* 4,860.
30.— Douglas county, 13,468.  *Less,* 3,400.
31.— Adams county, 6,889; Waushara county, 13,507.
  Total, 20,396.  *Excess,* 3,528.
32.— Bayfield county, 7,390; Sawyer county, 1,997; Washburn county, 2,926.
  Total, 12,313.  *Less,* 4,555.
33.— Buffalo county, 15,997; Pepin county, 6,932.
  Total, 22,929.  *Excess,* 6,061.
34.— Burnett county, 4,393; Polk county, 12,968.
  Total, 17,361.  *Excess,* 493.
35.— Florence county, 2,604; Forest county, 1,012; Oneida county, 5,010.
  Total, 8,626.  *Less,* 8,242.
36.— Green Lake county, 15,163; Marquette county, 9,676.
  Total, 24,839.  *Excess,* 7,971.
37.— Price county, 5,258; Taylor county, 6,731.
  Total, 11,989.  *Less,* 4,879.
38.— Towns in Brown county: Allouez, 363; Bellevue, 838; Eaton, 1,102; Howard, 1,261; Humboldt, 1,068; Green Bay, 1,008; Preble, 1,160; Suamico, 906; Scott, 1,288; Pittsfield, 941; Green Bay city, 9,069.  Fort Howard city: First, Second and Third wards, 2,584.
  Total, 21,588.  *Excess,* 4,720.
39.— Towns in Brown county: Ashwaubenon, 479; De Pere, 969; Glenmore, 1,441; Lawrence, 949; Morrison, 1,449; New Denmark, 1,553; Holland, 1,249; Rockland, 800; Wrightstown, 2,169; De Pere city, 3,625.  Fort Howard city: Fourth, Fifth and Sixth wards, 2,170.
  Total, 16,853.  *Less,* 15.
40.— Towns in Grant county: Cassville, 1,455; Clifton, 1,074; Harrison, 1,020; Hazel Green, 1,549; Jamestown, 961; Liberty, 881; Lima, 1,040; Paris, 778; Platteville, 3,687; Potosi, 2,110; Smelser, 1,295; Waterloo, 934.
  Total, 16,784.  *Less,* 84.
41.— Towns in Grant county: Bloomington, 1,174; Beetown, 1,257; Boscobel, 1,692; Castle Rock, 681; Ellenborough, 814; Fennimore, 1,423; Glen Haven, 883; Hickory Grove, 798; Lancaster, 3,289; Little Grant, 668; Marion, 573; Muscoda, 1,160; Mt. Hope, 640; Mt. Ida, 779; Millville, 197; Patch Grove, 690; Waterstown, 488; Woodman, 495; Wyalusing, 786; Wingville, 1,380.
  Total, 19,867.  *Excess,* 2,999.
42.— Milwaukee city: First ward, 9,341; Eighteenth ward, 7,923.
  Total, 17,264.  *Excess,* 396.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

43.— Milwaukee city: Seventh ward, 6,645; Third ward, 6,823.
    Total, 13,468. *Less*, 3,400.
44.— Milwaukee city: Thirteenth ward, 14,658. *Less*, 2,210.
45.— Milwaukee city: Fifteenth ward, 9,447; Sixteenth ward, 6,521.
    Total, 15,968. *Less*, 900.
46.— Milwaukee city: Tenth ward, 19,879. *Excess*, 3,011.
47.— Milwaukee city: Ninth ward, 22,469. *Excess*, 5,601.
48.— Milwaukee city: Second ward, 10,685; Sixth ward, 13,020.
    Total, 23,705. *Excess*, 6,837.
49.— Milwaukee city: Fourth ward, 10,291; Fifth ward, 10,168.
    Total, 20,459. *Excess*, 3,591.
50.— Milwaukee city: Eighth ward, 14,236. *Less*, 2,632.
51.— Milwaukee city: Eleventh ward, 13,768. *Less*, 3,100.
52.— Milwaukee city: Twelfth ward, 11,791. *Less*, 5,077.
53.— Milwaukee city: Fourteenth ward, 11,107. *Less*, 5,761.
54.— Milwaukee city: Seventeenth ward, 5,696. Towns in Milwaukee
    county: Lake, 4,899; Oak Creek, 2,087; Greenfield, 3,190; Frank-
    lin, 1,868.
    Total, 17,740. *Excess*, 872.
55.— Towns in Milwaukee county: Wauwatosa, 10,914; Granville, 2,272;
    Milwaukee, 6,403.
    Total, 19,589. *Excess*, 2,721.
56.— Racine city, 21,014. *Excess*, 4,146.
57.— Towns in Racine county: Burlington, 3,140; Caledonia, 2,732;
    Dover, 924; Mt. Pleasant, 2,192; Norway, 841; Raymond, 1,784;
    Rochester, 699; Waterford, 1,551; Yorkville, 1,391.
    Total, 15,254. *Less*, 1,614.
58.— Towns in Walworth county: Whitewater, 849; La Grange, 844;
    Troy, 972; East Troy, 1,406; Richmond, 799; Sugar Creek, 1,004;
    La Fayette, 933; Elkhorn, 1,557. Whitewater city, 4,359.
    Total, 12,723. *Less*, 4,145.
59.— Towns in Walworth county: Darien, 1,434; Delavan, 2,499; Ge-
    neva, 963; Lyons, 1,328; Sharon, 2,038; Linn, 854; Walworth,
    1,372; Bloomfield, 1,197; Spring Prairie, 1,155. Lake Geneva
    city, 2,297.
    Total, 15,137. *Less*, 1,731.
60.— Towns in Jefferson county: Concord, 1,331; Ixonia, 1,491; Lake
    Mills, 2,107; Milford, 1,439; Waterloo, incl. village, 1,838; Wa-
    tertown, 1,691. Watertown city: First ward, 2,150; Second
    ward, 1,611; Third and Fourth wards, 1,760; Seventh ward, 985.
    Total, 16,403. *Less*, 465.
61.— Towns in Jefferson county: Aztalan, 1,349; Cold Springs, 649;
    Farmington, 1,847; Hebron, 1,060; Jefferson, 4,053; Koskonong,

3,782; Oakland, 1,168; Palmyra, 1,357; Sullivan, 1,323; Sumner, 539.

Total, 17,127. *Excess,* 259.

62.— Towns in Dodge county: Chester, 736; Leroy, 1,413; Lomira, 1,816; Burnett, 1,026; Williamstown, incl. Mayville city, 2,196; Theresa, 1,761; Hubbard, 2,969; Trenton, 1,472. Waupun city: South ward, 1,695.

Total, 15,084. *Less,* 1,784.

63.— Towns in Dodge county: Fox Lake, 1,616; Westford, incl. East ward of Randolph, 1,296; Calamus, 1,083; Elba, 1,117; Portland, 1,163; Beaver Dam, 1,341; Lowell, 2,492; Shields, 919. Reeseville village, ——; Beaver Dam city, 4,222.

Total, 15,249. *Less,* 1,619.

64.— Towns in Dodge county: Clyman, 1,293; Emmett, 1,248; Herman, 1,478; Hustisford, 1,639; Lebanon, 1,505; Rubicon, 1,520; Ashippun, 1,344; Oak Grove, incl. Juneau, 2,375. Watertown city: Fifth and Sixth wards, 2,249.

Total, 14,651. *Less,* 2,217.

65.— Towns in Columbia county: Newport, 1,448; Lewiston, 936; Fort Winnebago, 646; Marcellon, 845; Caledonia, 1,336; Pacific, 255; Dekorra, 1,386; Lowville, 733. Portage city, 5,143.

Total, 12,728. *Less,* 4,140.

66.— Towns in Columbia county: Scott, 824; Randolph, 974; Courtland, incl. West ward of Randolph, 1,324; Springvale, 703; Wyocena, 1,303; West Point, 701; Lodi, 1,375; Arlington, 828; Leeds, 1,171; Otsego, 1,127; Hampden, 861; Fountain Prairie, 1,315; Columbus, 800. Rio village, 339; Columbus city, 1,977.

Total, 15,622. *Less,* 1,246.

67.— Towns in Sauk county: Delton, 829; Baraboo, 1,386; Fairfield, 672; Greenfield, 848; Freedom, 1,259; Honey Creek, 1,124; Sumpter, 761; Merrimac, 847; Troy. 911; Prairie du Sac, 1,180. Sauk city, 876; Prairie du Sac village, ——; Baraboo city, 4,605.

Total, 15,298. *Less,* 1,570.

68.— Towns in Sauk county: Dellona, 594; Winfield, 793; La Valle, 1,367; Woodland, 1,222; Ironton, 1,455; Reedsburg, 1,112; Excelsior, 1,299; Washington, 1,206; Westfield, 1,357; Bear Creek, 883; Franklin, 1,044; Spring Green, 1,208. La Valle village, ——. Reedsburg city, 1,737.

Total, 15,277. *Less,* 1,591.

69.— Towns in Fond du Lac county: Calumet, 1,399; Marshfield, 1,938; Taycheedah, 1,269; Friendship, 856; Eldorado, 1,458; Rosendale, 1,099; Alto, 1,316; Metomen, 1,853; Ripon and Ripon city, 4,543.

Total, 15,731. *Less,* 1,137.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

70.— Towns in Fond du Lac county: Lamartine, 1,232; Fond du Lac, 1,126. Fond du Lac city, 12,024.

Total, 14,382. *Less,* 2,486.

71.— Towns in Fond du Lac county: Ashford, 1,868; Auburn, 1,509; Byron, 1,216; Eden, 1,333; Empire, 873; Forest, 1,311; Oakfield, 1,324; Osceola, 1,272; Springvale, 1,092; Waupun, 1,115. Waupun city: North ward, 1,062.

Total, 13,975. *Less,* 2,893.

72.— Towns in Manitowoc county: Cato, 1,793; Centerville, 1,374; Eaton, 1,332; Liberty, 1,277; Meeme, 1,434; Rockland, 1,267; Schleswig, 2,053; Manitowoc Rapids, 1,914; Kossuth, 1,973; Franklin, 1,836; Maple Grove, 1,585; Newton, 1,726. Reedsville village, ——.

Total, 19,564. *Excess,* 2,696.

73.— Towns in Manitowoc county: Manitowoc, 1,275; Two Rivers, 1,108; Two Creeks, 607; Michicott, 1,417; Gibson, 1,651; Cooperstown, 1,629. Two Rivers city, 2,870; Manitowoc city, 7,710.

Total, 18,267. *Excess,* 1,399.

74.— Oshkosh city: First ward, 3,300; Second ward, 3,591; Third ward, 3,573; Fourth ward, 5,312; Fifth ward, 3,099.

Total, 18,875. *Excess,* 2,007.

75.— Towns in Winnebago county: Clayton, 1,170; Menasha, 595; Neenah, 538; Oshkosh, 1,489; Vinland, 936; Winchester, 1,030; Wolf River, 919. Neenah city, 5,083; Menasha city, 4,581.

Total, 16,341. *Less,* 527.

76.— Towns in Winnebago county: Algoma, 757; Black Wolf, 837; Nekimi, 1,028; Omro, 2,270; Poygan, 747; Utica, 981; Nepeuskun, 908; Rushford, 1,608; Winneconne, incl. village, 1,784. Oshkosh city: Sixth ward, 3,961.

Total, 14,881. *Less,* 1,987.

77.— Towns in Waupaca county: Union, 1,153; Bear Creek, incl. Lebanon, 2,068; Little Wolf, 1,487; Royalton, 1,198; Mukwa, 1,040; Caledonia, incl. Fremont vil. and town, 1,748; Weyauwega, incl. village, 1,252. New London city: First ward, 515; Second ward, 338; Fourth ward, 485; Fifth ward, 344.

Total, 11,628. *Less,* 5,240.

78.— Towns in Waupaca county: Matteson, 860; Larabee, incl. Clintonville, 2,902; Dupont, 1,386; Helvetia, 516; Saint Lawrence, 999; Waupaca, 964; Lind, 1,016; Dayton, 852; Farmington, 1,087; Scandinavia, 1,142; Iola, 1,315; Harrison, ——; Wyoming, ——. Waupaca city, 2,127.

Total, 15,166. *Less,* 1,702.

79.— Eau Claire city, 17,415. *Excess,* 547.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

80.— Towns in Eau Claire county : Bridge Creek, 1,122; Brunswick, 1,765;
   Clear Creek, 621; Drammen, 556; Fairchild, 1,215; Lincoln, 1,786;
   Ludington, 558; Otter Creek, 688; Pleasant Valley, 737; Seymour,
   406; Union, 674; Washington, 1,138. Altoona city, 805; Augusta
   city, 1,187.
   Total, 13,258. *Less,* 3,610.

81.— Towns in Marathon county: Bergen, incl. Emmett, 616; Brighton,
   686; Day, incl. McMillan, 1,255; Hamburg, 693; Halsey, 654; Hol-
   ton, 760; Hull, 893; Johnson, 313; Mosinee, 626; Marathon, incl.
   Cassell and Marathon city, 1,438; Reitbrock, 717; Rib Falls, 672;
   Spencer, 1,018; Stettin, 964; Frankfort, incl. Cleveland, Eau Plaine,
   and Wien, 1,284; Manville, ——.
   Total, 12,589. *Less,* 4,279.

82.— Towns in Marathon county : Berlin, 1,083; Easton, incl. Plover and
   Wausau, 1,620; Kronenwetter, incl. Knowlton and Pike Lake,
   1,139; Maine, 1,178; Weston, 1,776; Eldron, incl. Norrie, 585;
   Harrison, incl. Texas, 1,146. Wausau city, 9,253.
   Total, 17,780. *Excess,* 912.

83.— Sheboygan city, 16,359. *Less,* 509.

84.— Towns in Sheboygan county: Herman, 1,998; Sheboygan Falls,
   1,677; Lima, 1,921; Holland, 2,874; Wilson, 1,044; Sheboygan,
   2,117; Mosel, 863. Sheboygan Falls village, 1,118.
   Total, 13,612. *Less,* 3,256.

85.— Towns in Sheboygan county : Russell, 439; Greenbush, 1,690; Mitch-
   ell, 1,012; Scott, 1,473; Sherman, 1,736; Lyndon, 1,697; Rhine,
   1,612; Plymouth, 1,356. Plymouth city, 1,503.
   Total, 12,518. *Less,* 4,350.

86.— Towns in Waukesha county: Brookfield, 1,960; Menomonee, 2,480;
   New Berlin, 1,519; Pewaukee, 2,757; Lisbon, 1,443; Merton, 1,604;
   Oconomowoc, 1,373. Oconomowoc city, 2,729.
   Total, 15,865. *Less,* 1,003.

87.— Towns in Waukesha county: Delafield, 1,684; Eagle, 1,020; Genesee,
   1,327; Summit, 1,130; Muskego, 1,390; Vernon, 1,277; Ottawa,
   880; Mukwanago, 1,217; Waukesha, 7,480.
   Total, 17,405. *Excess,* 537.

88.— Towns in La Crosse county: Bangor, 1,138; Barre, 670; Green-
   field, 751; Hamilton, 1,942; Shelby, 1,003; Washington, 796. La
   Crosse City : Third and Thirteenth wards, 2,780; Fourth and
   Fourteenth wards, 2,156; Sixth and Sixteenth wards, 1,593;
   Seventh and Seventeenth wards, 2,516; Eighth and Eighteenth
   wards, 3,262.
   Total, 18,607. *Excess,* 1,739.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

89.—Towns in La Crosse county: Burns, 1,020; Campbell, 955; Farmington, 1,810; Holland, 1,009; Onalaska, 1,030. Onalaska city, 1,587; La Crosse city: First and Eleventh wards, 2,569; Second and Twelfth wards, 2,653; Fifth and Fifteenth wards, 2,649; Ninth and Nineteenth wards, 2,648; Tenth and Twentieth wards, 2,264.

Total, 20,194. *Excess*, 3,326.

90.— Towns in Dane county: Blooming Grove, 999; Fitchburg, 958; Madison, 919. Madison city, 13,426.

Total, 16,302. *Less*, 566.

91.— Towns in Dane county: Albion, 1.516; Bristol, 1,129; Christiana, 2,379; Cottage Grove, 1,305; Deerfield, 1.573; Medina, 1,393; Sun Prairie, 912; York, 963. Sun Prairie village, 704.

Total, 11,874. *Less*, 4,994.

92.— Towns in Dane county: Burke, 1,093; Windsor, 1,329; Vienna, 1,009; Westport, 1,893; Dane, 1,161; Springfield, 1,111; Berry, 1,003; Roxbury, 1,073; Mazomanie, 1,482; Black Earth, 742; Vermont, 892; Cross Plains, 1,103; Middleton, 1,433; Blue Mounds, 1,449; Springdale, 1,120; Verona, 1,225.

Total, 19,117. *Excess*, 2,249.

93.— Towns in Dane county: Dunkirk, 1,406; Dunn, 1,113; Pleasant Springs, 1,501; Rutland, 1,222; Oregon, 1,436; Montrose, 1,251; Primrose, 889; Perry, 996. Stoughton city, 2,470.

Total, 12,284. *Less*, 4,584.

94.— Towns in Outagamie county: Dale, 1,207; Greenville, 1,246; Grand Chute. 1,574; Center, 1,488. Appleton city, 11,869.

Total, 17,411. *Excess*, 543.

95.— Towns in Outagamie county: Black Creek, 1,377; Bovina, 663; Ellington, 1,210; Hortonia, 1,307; Liberty, 492; Maple Creek, 815; Osborn, 685; Cicero, 952; Maine, 478; Deer Creek, 932; Seymour, 977; Kaukauna, 1,728; Freedom, 1,602; Buchanan, 1,397. Seymour city, 733; Kaukauna city, 4,667; New London city, Third ward, 368.

Total, 20,383. *Excess*, 3,515.

96.— Towns in Chippewa county: Tilden, 1,313; Wheaton, 1,400. Chippewa Falls city, 8,670.

Total, 11,383. *Less*, 5,485.

97.— Towns in Chippewa county: Anson, 533; Arthur, 622; Auburn, 1,584; Big Bend, 820; Bloomer, 2,351; Cleveland, 395; Colburn, 347; Eagle Point, 1,282; Edson, 2,164; Flambeau, 289; La Fayette, 1,514; Lawrence, 272; Sigel, 1,587.

Total. 13,760. *Less*, 3,108.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

· 98.— Towns in Rock county: Avon, 806; Beloit, 714; Center, 1,073; Magnolia, 1,098; Newark, 1,039; Plymouth, 1,188; Spring Valley, 1,422; Turtle, 993; Union, 950. Evansville village, 1,523; Beloit city, 6,315.

Total, 17,121. *Excess*, 253.

99.— Towns in Rock county: Bradford, 849; Clinton, 1,105; Fulton, 1,363; Harmony, 1,083; Janesville, 926; Johnstown, 1,034; La Prairie, 832; Lima, 1,109; Milton, 2,300; Porter, 1,235; Rock, 976. Clinton village, 856; Edgerton city, 1,595.

Total, 15,263. *Less*, 1,605.

100.— Janesville city, 10,836. *Less*, 6,032.

*Geo. W. Bird*, of counsel for the plaintiff:

(1) The demurrer and motions present the whole case and all questions involved in it for argument and determination upon the merits. R. S. sec. 2681; *Diggle v. Boulden*, 48 Wis. 477–482; *Lerdall v. Charter Oak L. Ins. Co.* 51 id. 426; *Magdeburg v. Uihlein*, 53 id. 165; *Krall v. Libbey*, id. 292; *Straka v. Lander*, 60 id. 115; *Hoffman v. Wheelock*, 62 id. 434; *Hurlbut v. Marshall*, id. 590–601; *Lander v. Hall*, 69 id. 326; *Guth v. Lubach*, 73 id. 131; *Potter v. Van Norman*, id. 339.

(2) The court has full and complete jurisdiction of the subject of the action. This was fully and finally settled in the former case. *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440. And this court was not without abundant well considered authority and precedent for its decision. Courts of last resort had already taken jurisdiction to pass directly upon the validity of apportionment acts in the following cases: *State ex rel. Gardner v. Newark*, 40 N. J. Law, 297; *State ex rel. v. Campbell*, 48 Ohio St. 435; *State ex rel. Singleton v. Van Duyn*, 24 Neb. 586; *Prouty v. Stover*, 11 Kan. 235; *State ex rel. Att'y Gen. v. Francis*, 26 id. 734; *People ex rel. Van Bokkelen v. Canaday*, 73 N. C. 198. Nor were precedents wanting wherein, as well said in that case, the legislature itself had deemed the question to be a judicial

one, to be decided by the courts, and had submitted the constitutionality of apportionment acts to the decision of the judges. See *Opinions of Justices*, in 3 Me. 477; 18 id. 458; 33 id. 587; 7 Mass. 523; 15 id. 506; 3 Pick. 517; *Henshaw v. Foster*, 9 id. 312; *Capen v. Foster*, 12 id. 485; *Opinions of Justices*, 23 id. 547; 6 Cush. 575; *Warren v. Charlestown*, 2 Gray, 84; *Opinions of Justices*, 10 id. 613. Since the decision of this court, the supreme court of Michigan, in two well considered cases brought to test the constitutionality of apportionment acts of that state, has held the court rightfully clothed with jurisdiction to pass upon the question, and has adjudged certain acts of that state violative of the constitution of Michigan, and that too in particulars as to which the act in this case is challenged. *Giddings v. Blacker*, 52 N. W. Rep. 944; *Supervisors v. Blacker*, 52 N. W. Rep. 951. And more recently, the supreme court of New York, in special term, has assumed such jurisdiction and held the apportionment law of that state in conflict with the constitution of New York on grounds urged against the act in this case. And long prior to this court's decision, the supreme court of New York in *Kinney v. Syracuse*, 30 Barb. 349, the supreme court of Michigan in *People ex rel. Att'y Gen. v. Holihan*, 29 Mich. 116, and this court in *Slauson v. Racine*, 13 Wis. 398, had assumed to enforce the constitutional limitation upon the legislature's apportioning power as to the time of its exercise.

(3) Upon the refusal of the attorney general to bring the action or to allow it to be brought in his name, it may be maintained by the state upon the relation of one having, as here, no other interest than that of a citizen of the state and the United States, and an elector of Dane county, leave therefor having been first had and obtained. Where the object of the suit is a matter of public concern and the enforcement of a public, not a private, right, the relator need have no special or personal interest in the result to enable

the state to maintain the action on his relation.   It is suffi-
cient if he be interested only as a citizen in having the laws
executed and the right in question enforced.   High, Ex.
Leg. Rem. sec. 431; Mechem, Pub. Off. sec. 948; 14 Am. &
Eng. Ency. of Law, 218; *People ex rel. Blacksmith v. Tracy*,
1 How. Pr. 189; *People ex rel. Fuller v. Supervisors*, 18 id.
461; *People ex rel. Case v. Collins*, 19 Wend. 56; *Hamil-
ton v. State ex rel. Bates*, 3 Ind. 452; *State ex rel. Byers v.
Bailey*, 7 Iowa, 390; *State ex rel. Rice v. County Judge*, 7
id. 186; *Thompson v. Kearney*, 25 Neb. 262; *Pike Co. v.
People ex rel. Metz*, 11 Ill. 202; *People ex rel. Peair v.
Board of Ed.* 127 Ill. 613; *State ex rel. Currie v. Weld*, 39
Minn. 426; *People ex rel. Stephens v. Halsey*, 37 N. Y. 344;
*Att'y Gen. v. Boston*, 123 Mass. 460–479; *U. P. R. Co. v.
Hall*, 91 U. S. 343–355; *Att'y Gen. v. Railroad Cos.* 35 Wis.
425; *State ex rel. Drake v. Doyle*, 40 id. 175; *State ex rel.
Att'y Gen. v. Cunningham*, 81 id. 440.   The rule is that the
action may in any event be brought upon leave duly ob-
tained, by the attorney general, if he will, or, if he refuse
or unreasonably delay, by and upon the relation of any cit-
izen.   *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440,
444.   The refusal of the attorney general to bring the ac-
tion or to allow it to be brought in his official name, does
not change the rule or prevent the maintenance of the ac-
tion.   The state is the real plaintiff and it alone can bring
and maintain the action.   It may bring it upon the rela-
tion of either the attorney general or a private citizen, but
upon the latter's only upon the former's refusal or unrea-
sonable neglect.   See especially opinion of PINNEY, J., 81
Wis. 488, 499, 500; also *State ex rel. Drake v. Doyle*, 40 id.
175.   Where the attorney general is hostile to the proceed-
ing or disposed to obstruct it, his acts will not be permitted
to defeat the action.   In the exercise of its original juris-
diction conferred by the constitution for prerogative pur-
poses, the court is not bound by any technical rules of

practice or pleading either as to the time or manner of its exercise. Bacon's Abr. PREROGATIVE; 2 Abbott's Law Dict. 305; *Att'y Gen. v. Railroad Cos.* 35 Wis. 522; *Att'y Gen. v. Eau Claire*, 37 id. 443.

(4) The acts sought to be restrained are purely ministerial and therefore properly subject to control by injunction. The statutes leave nothing to the discretion of the secretary of state in the performance of the duties here in question. *Mississippi v. Johnson*, 71 U. S. 437; *Board of Liquidation v. McComb*, 92 U. S. 531; *Osborn v. U. S. Bank*, 9 Wheat. 738; *Davis v. Gray*, 83 U. S. 203; *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 492.

(5) The act in question is unconstitutional and void. [Mr. Bird considered the act at length and in detail, pointing out many instances in which he claimed that it violated the constitutional requirements.]

(6) No embarrassments can be urged to prevent decision. Abundant authority is reposed in executive and legislature to avoid all such if any were likely to occur. This court cannot consider consequences when proceeding in cases *publici juris*. It has there no discretion to exercise, but must declare the law. *Att'y Gen. v. Railroad Cos.* 35 Wis. 552, 594; *Att'y Gen. v. Eau Claire*, 37 id. 400; *State ex rel. Drake v. Doyle*, 40 id. 175. However it may be with statutes, constitutional provisions are mandatory. They are the commands of the people in their sovereign capacity to the legislature, their agent and representative. The agent cannot disobey them; if it do its acts are void and the court must so adjudge. *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440; Cooley, Const. 78-79; *Brown v. Goben*, 122 Ind. 113; *People ex rel. Crowell v. Lawrence*, 36 Barb. 186; *People ex rel. Pond v. Supervisors*, 65 Hun, 263.

*Geo. G. Greene*, for the plaintiff:

Although the right to challenge an apportionment act for disobedience of the constitutional mandate can no longer

be denied at the bar of this court, it is pertinent to notice how much this case is within the reason of that right. " The power vested in the American courts of justice, of pronouncing a statute to be unconstitutional, forms one of the most powerful barriers which has ever been devised against the tyranny of political assemblies." 1 De Tocqueville Works, 129. A legislative apportionment act, more than any other, is within the ground of this approval. " No invasions of the constitution," said Jefferson, vindicating Washington's veto of the federal apportionment of 1790, " are so fundamentally dangerous, as the tricks played on their [legislators'] own numbers, *apportionment* and other circumstances respecting themselves, and affecting their qualifications to legislate for the union." 1 Story, Const. sec. 683, note. The principle that the will of the , people, exerted by deputies chosen by popular vote, governs, is organic in both the federal and state constitutions. The former requires it to remain organic in the latter, by declaring: " The United States shall guarantee to every state in this union a republican form of government." Const. of U. S. art. IV, sec. 4. A legislature, intentionally constituted to misrepresent the will of the people, does not fill the guaranty. If a state constitution should directly provide that, in the election of legislators, the votes of some electors, or classes of them, should have but one third or one half the effect of others, its government would not be republican in form. Nor is it, when the same thing may be designedly done indirectly. The state constitution takes good care that such misrepresentation shall not occur. The rule of population (in sec. 3, art. IV) is leveled against giving a popular minority a legislative majority, or a popular majority an undue legislative majority, by *design*. The care and vigor with which it is maintained by a similar provision in nearly every American constitution, is due to the warning of a great example. The House of Commons

was for centuries representative of the people in theory, but not in fact. 3 Hallam's Works, 43; De Lolme, Court Hist. 144; Encyclopedia Britannica, art. GOVERNMENT. The federal constitution and Ordinance of 1787 were framed when representation in the Commons was at its worst. On this hint they spake. The Ordinance declared that the people of the Northwest territory should "always be entitled to the benefits of . . . a *proportionate* representation of the people in the legislature." Art. II. That pledge, as pointed out, was carried into the constitution of this state by an exact equivalent in the command to apportion and district legislators according to population. The words of the mandate will not bear a construction that gives the legislature a *discretion* to depart from the numerical measure of representation. " Perfect exactness in the apportionment according to the number of inhabitants is neither required nor possible, but there should be as close an approximation to exactness as possible, and this is the utmost limit for the exercise of legislative discretion." *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 484; 1 Story, Const. secs. 682, 683, and note; 1 Kent, Comm. 231; *Opinions of the Justices*, 18 Me. 458; *Giddings v. Blacker*, 52 N. W. Rep. 948. Of the concurrent rules of apportionment that of population is the last that should yield to defeat its purpose, for it is the most important. The rule of boundary must be enforced if possible. It is inflexible; must be literally pursued, or not at all. So of the rule of contiguity. That of population is more pliant, and may be made to fit the other rules without foiling its aim. Such concordant enforcement is required by the canon of interpretation, that " one part is not allowed to defeat another, if by any reasonable construction the two can be made to stand together." Cooley, Const. Lim. 72.

In matters of public right, especially if the fundamental rights of citizenship are involved, the relator in these pro-

ceedings "need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and, as such, interested in the execution of the law." High, Ex. Leg. Rem. sec. 431; 14 Am. & Eng. Ency. of Law, 216; Mechem, Pub. Off. sec. 948; *U. P. R. Co. v. Hall*, 91 U. S. 343, 355; *State ex rel. Currie v. Weld*, 39 Minn. 426; *People ex rel. Peair v. Board of Ed.* 127 Ill. 613; *State ex rel. Hanna v. Common Council*, 33 N. J. Law, 110; *People ex rel. Kelly v. Common Council*, 77 N. Y. 503; *State ex rel. Weiss v. Dist. Board*, 76 Wis. 177; *Willard v. Comstock*, 58 id. 565. This right of the citizen does not depend on the option of the attorney general; and his consent or presence is not indispensable. *People ex rel. Case v. Collins*, 19 Wend. 56; *Att'y Gen. v. Boston*, 123 Mass. 460, 479; *Giddings v. Blacker*, 52 N. W. Rep. 944; *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 443; *State ex rel. Drake v. Doyle*, 40 id. 185; *State ex rel. Wood v. Baker*, 38 id. 81.

*Charles E. Estabrook*, of counsel, for the plaintiff:

(1) That the subject matter of this action is one over which this court has original jurisdiction, is settled by the decision in *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440; and the view of the law adopted by the court in that case has been approved and followed in two cases in Michigan. *Giddings v. Blacker*, 52 N. W. Rep. 944; *Supervisors v. Blacker*, 52 N. W. Rep. 951.

(2) The relator has the right to bring and maintain this action, leave of court having first been obtained. The rule requiring the subject to be presented through the attorney general unless that officer shall refuse, as he has in this case, is simply to prevent officious intermeddling by the attempted use of this prerogative writ, and is not a necessary regulation or consequence following from some constitutional or statutory provision. When the subject matter is once before the court in due form, it is immaterial who the relator is. It is the subject matter presented, and not

the mode in which it is presented, which determines the question of the jurisdiction of the court. *State ex rel. Drake v. Doyle*, 40 Wis. 175, 186. See opinion by PINNEY, J., in *State ex rel. Att'y Gen. v. Cunningham*, 81 id. 488; *Giddings v. Blacker*, 52 N. W. Rep. 944–6; *Wheeler v. N. Col. Irr. Co.* 9 Col. 248, 256.

(3) The act in question violates the constitution, disregarding in many instances the rule requiring proportional representation, as well as other constitutional requirements.

(4) The proper relief is clearly that granted in the former case. The case before the court presents a positive violation of positive public law (the constitution) to positive public injury (taking away the right of equal representation); and, having jurisdiction of this writ to restrain and prevent such public injury, there is no room for discretion. The duty is positive, *ex debito justitiæ. Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 595; *State ex rel. Drake v. Doyle*, 40 id. 220, 236; *In re Oshkosh Mut. F. Ins. Co.* 77 id. 366, 368. When this court sits as a court of high judicature, exercising the prerogative power with which the constitution has clothed it, without discretion, but bound to enforce the law as it understands it, to preserve the liberties of the people, no rules of procedure, statute or otherwise, can hamper or restrain the exercise of its authority. *Giddings v. Blacker*, 52 N. W. Rep. 944, 946. The objections upon which the defendant bases his demurrer seem to involve simply this proposition, that notwithstanding the fact that the constitution vests this court with original jurisdiction to issue writs of injunction and other remedial and original writs, such power is given subject to the supervisory direction of the attorney general, to be exercised at his good pleasure. The source of the power thus claimed to reside in the attorney general is not disclosed. Heretofore it has been considered the duty of the attorney gen-

eral, "To appear for the state and to prosecute or defend all actions and proceedings, civil or criminal, in the supreme court, in which the state shall be interested or a party." R. S. sec. 163, subd. 1; *State ex rel. Turner v. Circuit Court,* 71 Wis. 595.

*John C. Spooner,* of counsel, for the plaintiff. [*Mr. Spooner* filed no formal brief, but closed the discussion on behalf of the plaintiff in an exhaustive oral argument. It has been found impossible, in any brief abstract, to do even approximate justice to his argument.]

*William F. Vilas,* for the defendant, contended that a private citizen who has himself no right of action, who suffers no personal injury, cannot, against the judgment and decision of the attorney general, exercise the functions of that officer to prosecute, purely in the public right, a suit in chancery in the name of the state to obtain *an injunction* to interrupt the political administration of the laws in relation to elections, moving confessedly in accordance with the statutes of the legislature.

(1) A private citizen sustains no recognizable injury and takes no right of action by reason of any invasion or infraction of the rights of the state, unless he sustains thereby himself special, individual damage in person or property, and then only to the extent necessary for protection or redress of his personal or property rights. The state is not the representative of any one, but of all; it does not respond to the wishes of one, but its officers must be governed by the common interest of all; and while their performance of the duties charged upon them by the laws may be enforced, no individual can take the performance of them upon himself without lawful delegation. These principles govern peculiarly the preventive remedy of the writ of injunction, and are most frequently applied in reference to that comprehensive class of cases growing out of alleged nuisances. High, Inj. (3d ed.), sec. 762; *Clark v.*

*C. & N. W. R. Co.* 70 Wis. 593; *Zettel v. West Bend,* 79 id. 316; *Carpenter v. Mann,* 17 id. 155; *Bigelow v. Hartford B. Co.* 14 Conn. 565–79; *O'Brien v. N. & W. R. Co.* 17 id. 372; *Frink v. Lawrence,* 20 id. 117; *Payne v. McKinley,* 54 Cal. 532; *Jarvis v. S. C. V. R. Co.* 52 id. 438; *San Jose R. Co. v. Brooks,* 74 id. 463; *Hargro v. Hodgdon,* 89 id. 623; *D. & M. R. Co. v. Stump,* 8 Gill & J. (Md.), 479; *Schall v. Nusbaum,* 56 Md. 512; *Barnum v. M. T. R. Co.* 33 Minn. 365; *South Carolina S. Co. v. S. C. R. Co.* 9 S. E. Rep. 650; *Corning v. Lowere,* 6 Johns. Ch. 439; *Smith v. Lockwood,* 13 Barb. 209; *People v. Vanderbilt,* 28 N. Y. 396; *Bechtel v. Carslake,* 11 N. J. Eq. 500; *Higbee v. C. & A. R. Co.* 19 id. 276; *Ottumwa v. Chinn,* 75 Iowa, 405; *Innis v. C. R., I. F. & N. W. R. Co.* 76 id. 165; *Ingram v. C., D. & M. R. Co.* 38 id. 675; *Garnett v. J., St. A. & H. R. R. Co.* 20 Fla. 889; *Mayor v. Alexandria C. Co.* 12 Pet. 91; *Spencer v. L. & B. R. Co.* 8 Sim. 193; *Crowder v. Tinkler,* 19 Ves. Jr. 617; *Needham v. N. Y. & N. E. R. Co.* 152 Mass. 61; *Biddle v. Ash,* 2 Ashm. 211; *Ware v. Regent's C. Co.* 3 De G. & J. 212, 228; *Van Horne v. N. P. R. Co.* 48 N. J. Eq. 332; *Putnam v. Valentine,* 5 Ohio, 189. The like rule extends to all cases of the crown or government, " or of those who partake of its prerogative (such as idiots and lunatics), or whose rights are under its particular protection (such as the objects of a public charity)." Story, Eq. Pl. sec. 8; *Burbank v. Burbank,* 152 Mass. 254; *Strickland v. Weldon,* L. R. 28 Ch. Div. 426. But, especially as relates to political subjects, this principle has been applied with undeviating certainty. *Judd v. Fox Lake,* 28 Wis. 587; *Doolittle v. Supervisors,* 18 N. Y. 155; *Sparhawk v. U. P. R. Co.* 54 Pa. St. 401; *Davis v. Mayor,* 2 Duer, 663, 14 N. Y. 506; *Hale v. Cushman,* 6 Met. 425; *Gibbs v. Green,* 54 Miss. 593; *Comm. v. Burrell,* 7 Pa. St. 34; *Newark Aq. Board v. Passaic,* 45 N. J. Eq. 393; *Jones v. Black,* 48 Ala. 540; *Seager v. Kankakee,* 102 Ill. 669. The doctrine of these and numerous

other cases does not rest upon any mere rule of procedure or the convenience of courts, but upon the absence of right in a private citizen to interfere with matters of public concern which are by the constitution and laws committed to the government of officers chosen by the community and alone authorized to represent them.

(2) The same principles and authorities equally deny to a private person, in no wise specially interested, any right to sue for the writ of injunction *in the name of the state*, as in his own.   The jurisdiction of this court to issue the writ of injunction was given by the constitution when the tribunals of law were distinct from those of equity, and the measure of the grant is to be found in the law of the court of chancery.   *Att'y Gen. v. Railroad Cos.* 35 Wis. 517.   By the law and practice of the court of chancery, any suit going wholly upon the public right must be prosecuted by the attorney general, and a private relator is neither necessary, nor, if made use of by the attorney general, is a party with any right either to institute or control it.   Story, Eq. Pl. sec. 8; *Att'y Gen. v. Parker*, 126 Mass. 221; *Att'y Gen. v. Evart B. Co.* 34 Mich. 462; *Att'y Gen. v. East India Co.* 11 Sim. 380; 1 Daniell, Ch. Pl. & Pr. 7; *Burbank v. Burbank*, 152 Mass. 254; *Strickland v. Weldon*, L. R. 28 Ch. Div. 426; *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 471, 487–8.   Decisions as to the nature of the interest which will support the writ of *mandamus* do not indicate the interest which will support an information for an injunction.   The writ of *mandamus* did not issue from chancery nor in the exercise of ordinary jurisdiction between suitors.   It issued from the common law court of King's Bench, and in the exercise of its supervisory jurisdiction, its superintending control over the inferior courts, ministers of the law, and corporate creatures of the realm, with the sole object of requiring performance of those duties enjoined upon them by public law.   This right of super-

visory control the court of King's Bench enforced upon different principles from those maintained by the court of equity in granting preventive relief. 3 Bl. Comm. 110; *Marbury v. Madison*, 1 Cranch, 62–3. The court of King's Bench always, so far as known, entertained the application for a *mandamus* of any person to compel a public officer, public body, or corporate creature to perform a duty enjoined by the law, notwithstanding the petitioner's injury was not peculiar or different from that suffered by others. Tap. Mand. 4, 5, 287–8; *Hall v. U. P. R. Co.* 3 Dill, 521; *King v. Dean*, 2 Maule & S. 82; *King v. S. & W. R. Co.* 2 Barn. & Ald. 646; *King v. Bristol Dock Co.* 6 Barn. & Cr. 181; *Clarke v. L. & N. C. Co.* 6 Ad. & El. (N. S.), 898; *Queen v. Fall*, 1 id. 636. No case has questioned the equity rule that the attorney general must sue for an injunction sought in the public right alone. As to the decision in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, to the effect that this court's jurisdiction of the writ of injunction is of it as a *quasi* prerogative writ, the object of that decision was only to controvert the idea that a general original jurisdiction is given this court in all cases of equitable cognizance where an injunction is sought, and to limit that jurisdiction to those public causes in which the writ ought to go at the suit of the attorney general in the right of the state. It in no manner determined that the writ of injunction should issue upon any new grounds or under any new rules of practice, but the contrary was expressly stated. (p. 520.)

(3) The function of the attorney general to institute and conduct suits and prosecutions *publici juris* is conferred upon him as other public duties are imposed upon other administrative officers, and cannot rightfully be withdrawn from him and conferred upon a private suitor. It has been shown that, by the law of England and the courts of chancery everywhere, no case resting on the public right can be entertained without his presence; that none will be in-

stituted in behalf of the state but by him or under his direction. And that leaves the question of instituting a public suit entirely to him; a discretion which the court of chancery recognized and did not force. *Baines v. Baker,* 1 Ambler, 158; 3 Atk. 750. Can there be doubt that this court would refuse an application for *mandamus* to compel him (not having been required thereto in any of the instances specially provided for by statute) to bring an action which he declared it against his judgment to institute. Mechem, Officers, sec. 961; *People ex rel. Demarest v. Fairchild,* 67 N. Y. 334; *People ex rel. Peabody v. Att'y Gen.* 22 Barb. 114; *People ex rel. Yates v. Att'y Gen.* 41 Mich. 728; *Coon v. Att'y Gen.* 42 id. 65; High, Ex. Leg. Rem. sec. 45. The suggestion of RYAN, C. J., in *State ex rel. Wood v. Baker,* 38 Wis. 81, that before the present statute "the courts of the state might perhaps, in proper cases, have authorized proceedings in the name of the attorney general if that officer wrongfully refused to act and it was necessary to proceed in his name " was made, obviously, without serious consideration, and appears to have been erroneously made. *People ex rel. Demarest v. Fairchild,* 67 N. Y. 334; *Rex v. Carmaethen,* 2 Burr. 869; *Wallace v. Anderson,* 5 Wheat. 291. But if that suggestion were to ripen into law, yet this order granting leave ought to be vacated. For upon what foundation can this court find that the attorney general has *wrongfully* refused to bring this action? The order obtained by the relator proceeds upon no consideration of the reasons for his action, and they are not before the court.

(4) The relator's proceeding should be dismissed because it is upon its face a political action, designed only to effect a political object, not to protect a relator from any threatened invasion of any right which the judicial tribunals were established to guard. *Judd v. Fox Lake,* 28 Wis. 587; *Georgia v. Stanton,* 6 Wall. 50; *Marbury v. Madison,* 1

Cranch, 49; *Jones v. Black*, 48 Ala. 540; *Gibbs v. Green*, 54 Miss. 593; *Comm. v. Burrell*, 7 Pa. St. 34; *People ex rel. Fitnam v. Galesburg*, 48 Ill. 485; *Walton v. Develing*, 61 id. 201; *Darst v. People*, 62 id. 306; *Dickey v. Reed*, 78 id. 261; *Harris v. Schryock*, 82 id. 119. In another particular his suit invokes an exercise of power which courts always deny; it seeks only to interrupt a *pending* election. *Jones v. Black*, 48 Ala. 540; *Harris v. Schryock*, 82 Ill. 119; *Dickey v. Reed*, 78 id. 261; *Walton v. Develing*, 61 id. 201. The circumstances demand the application of another familiar rule well expressed by Dixon, C. J., in *Sheldon v. Rockwell*, 9 Wis. 180. "The granting or refusal of injunctions rests in the sound discretion of the court. They are never granted when they are against good conscience, or productive of hardship, oppression, injustice, or public or private *mischief*."

(5) The evils which might result from the acceptance of the proposition upon which the relator founds this proceeding should be considered. If it be admitted that such a relator may be recognized and the attorney general disregarded, then it must practically follow that the leave to sue will be granted on every such complaint; certainly on every one which offers a seeming case. And leave would soon become a matter of course in order that an unbiased hearing might be awarded to the defendant when he should come in. Another consequence of such a rule would be the suppression of the functions of the state's law officer in deciding upon the advisability or wisdom of instituting a suit, even if grounds for it happen to exist. The rule would be as applicable to the circuit courts as to this court. Const. art. VII, sec. 8. It would follow that all the public officers would be liable to be challenged to show cause for the exercise of their powers at the capricious complaint of any citizen volunteering in the public behalf. There is no reason why a public officer should be exposed to such bur-

dens.    It is clear that the public rights might often fail of
adequate presentation, whether by the volunteer champion
who professed to represent them, or the harried defendant
who should regard defense, at his private cost, as no part
of his official duty.    The advantage of the conduct of pub-
lic causes by a public officer, who may be expected to con-
sider the public interests only and yield nothing to the
excessive zeal or partisanship of private interests, has often
been insisted upon by courts.    *Comm. v. Burrell,* 7 Pa. St.
34; *Rush v. Cavenaugh,* 2 id. 189.

CASSODAY, J.    1. Counsel for the defendant challenges
the jurisdiction of this court in this cause, and supports
such contention with much learning and ability.    The ques-
tion of the original jurisdiction or power of this court under
sec. 3, art. VII, of the constitution, " to issue writs of
*habeas corpus, mandamus,* injunction, *quo warranto, cer-
tiorari,* and other original and remedial writs, and to hear
and determine the same," has frequently been considered
by this court.    *Att'y Gen. v. Blossom,* 1 Wis. 317; *Att'y
Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567; *State ex rel.
Att'y Gen. v. Messmore,* 14 Wis. 115; *Cooper v. Mineral
Point,* 34 Wis. 181; *Att'y Gen. v. Railroad Cos.* 35 Wis.
425; *Att'y Gen. v. Eau Claire,* 37 Wis. 400; *State ex rel.
Wood v. Baker,* 38 Wis. 71; *State ex rel. Cash v. Juneau
Co.* 38 Wis. 554; *State ex rel. Drake v. Doyle,* 40 Wis. 175;
*Petition of Semler,* 41 Wis. 522; *In re Pierce,* 44 Wis. 411;
*State v. St. Croix Boom Corp.* 60 Wis. 565; *State ex rel.
Att'y Gen. v. Cunningham,* 81 Wis. 440; *State ex rel. Ray-
mer v. Cunningham,* 82 Wis. 39.    Most, if not all, of these
cases were argued with great learning and ability, and
then carefully considered by the persons constituting the
court at the times they were respectively submitted; and
hence must be regarded not only as highly persuasive, but
as absolutely binding upon us as authority.

Conscious of the importance of the case at bar, we have diligently sought the guidance of the recorded opinions of the court in the cases cited, so far as applicable, in coming to the conclusions reached, and none more so than the utterances of the late learned and able Chief Justice RYAN. Among the propositions so firmly established as to require no further exposition from this court are those to the effect that the constitutional clause quoted " was designed to give this court original jurisdiction of all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people;" that such prerogative writs, including injunction as a *quasi* prerogative writ, can properly issue only at the suit of the state *or* the attorney general in the right of the state; that " in matters strictly *publici juris*, in which no one citizen has any right or interest other than that which is common to citizens in general, a petition by a private person for leave to commence an action in this court in the name of the state cannot properly be considered until the attorney general has been requested to move in the matter, and has refused or unreasonably delayed to do so;" that in all cases in which an exercise of such original jurisdiction is sought, whether by such private citizen or the attorney general, leave must first be obtained from this court upon a *prima facie* showing that the case is one calling for the exercise of such jurisdiction; that the official acts of the secretary of state in issuing or publishing notices of an election of members of the legislature under an apportionment act alleged to be invalid, are purely ministerial; and hence, in the exercise of such original jurisdiction, this court may control the same either by *mandamus* or injunction as the exigencies of the case may require. We do not understand counsel for the defendant to question the correctness of the decision in *State ex rel. Att'y Gen. v. Cunningham*, 81

Wis. 440; and hence it is, in effect, conceded that the court has jurisdiction of the subject matter of the case at bar.

The precise objection to the jurisdiction here presented is that its exercise has not been invoked by the attorney general, and hence that the court is powerless to consider the case at all without his consent and co-operation. In *State ex rel. Wood v. Baker*, 38 Wis. 80, 81, RYAN, C. J., said: "The jurisdiction conferred on this court by the constitution is of *informations* in the nature of *quo warranto*, as substituted in modern times for the use of the ancient writ itself, and as used when the constitution was framed. This was a prerogative proceeding, *quasi* criminal and *quasi* civil in its character, according to its use, but always classed with criminal informations. . . . The mode of proceeding under this jurisdiction might be regulated by statute, *but the jurisdiction itself could not be defeated or abridged*. . . . It was undoubtedly competent for the legislature to give a *quasi* civil proceeding in such cases, but not to abolish the *quasi* criminal jurisdiction vested in the court by the constitution. This appears to us to be a matter of substance, not of form." He then referred to the statute expressly authorizing such *quo warranto* "by a private person" in the name of the state when the attorney general refuses to act, and said: "Before such statute, the courts of the state might perhaps, in proper cases, have authorized proceedings in the name of the attorney general, if that officer wrongfully refused to act and it was necessary to proceed in his name." That action was commenced by a private relator on his own complaint; but the court having become, as stated in the opinion, "embarrassed by the *form* of the proceedings," the same were, on the suggestion of the court, amended by the attorney general signing the summons and information *nunc pro tunc*. Thus it is apparent that the court regarded the want of

the attorney general's signature as a mere defect of form, and not of substance. The learned counsel for the defendant characterizes the last quotation as a mere *obiter dictum*, and it may have been subject to such criticism at the time it was said. However that may be, the proposition received an authoritative sanction from the same learned chief justice, speaking for the whole court, in *State ex rel. Drake v. Doyle,* 40 Wis. 185 *et seq.* That was an application, made by Drake as relator by his own complaint and by his own attorney in the name of the state, for a *mandamus* to compel the secretary of state to revoke and cancel a license to an insurance company, and the attorney general appeared as counsel for and defended the secretary. Chief Justice RYAN, speaking for the whole court, there said: " It was stated by the attorney general that the suit of the relator against the insurance company had been settled; that the relator has *no further interest* in the question, and therefore *no further right* to the writ. The fact does not appear of record, *but it is immaterial.* So far as the private right of the relator is concerned, it is now well settled that this court would not assume original jurisdiction to enforce it." Then, partly quoting from his former opinions, he said: " But in a government like ours public rights of the state and private rights of citizens often meet, and may well be involved in a single litigation. So it may be in the exercise of the original jurisdiction of the court. The prerogative writs can issue only at the suit of the state *or* the attorney general in the right of the state. *They may go on the relation of a private person, and may involve private right.* And the question before us is *not upon the private right* of the relator, *and is independent of the accident that there is a relator in the case.* The question on which the exercise of jurisdiction here must turn is whether the subject matter of the writ is one ' *quod ad statum reipublicæ pertinet;* ' one affecting the sovereignty

of the state, its franchises or prerogatives. And on this question there appears to us to be no room for doubt. . . . Whether the respondent be right or wrong in his view, and that is for this court and not for him to determine, it is very certain that it concerns the state at large that one of its principal officers executes his office in positive and deliberate disregard of a public statute defining its duties. Such a case, when presented, is one eminently calling for the exercise of our original jurisdiction; one, *with or without a relator*, eminently fit to be presented to the court for adjudication. The writ of *mandamus*, in such a case, eminently serves its function as a prerogative writ."

In Merrill on Mandamus (just published) the conflicting decisions upon the question whether a public right can be enforced by a private party as relator are considered; and it is there said that "the rule refusing the privilege to private parties of obtaining a *mandamus* to enforce public duties is one of discretion, and not of law; *and the court will ignore it when the attorney general refuses to appear to complain of alleged omissions of duty by public officers.*" § 229. It is there further said that "the great weight of American authority is to the effect that, where the relief sought is a public matter or a matter of public right, the people at large are the real party, and *any citizen* is entitled to the writ of *mandamus* to enforce the performance of such public duty." Id. § 230, citing numerous cases. That such is the settled rule in this state is manifest from the quotations made from the opinion of RYAN, C. J., in *State ex rel. Drake v. Doyle*, 40 Wis. 185.

The learned counsel for the defendant concedes "that the court of King's Bench always, so far as known, entertained the application for a *mandamus* of *any person* to compel a public officer, public body, or corporate creature to perform a duty enjoined by the law, notwithstanding the petitioner's injury was not peculiar *or different* from that suffered

by others;" but he insists with much elaboration that such
supervisory control is "enforced upon different principles
from those maintained by the *court of equity* in granting
preventive relief for the protection of the rights of its suit-
ors." It is true, as argued, that the writ of injunction
issues upon the determination of the controversy to enforce
the decree entered therein, and hence is generally regarded
as merely remedial in its nature; whereas a *mandamus*
issues at the commencement of the action, and is to enforce
a strictly legal right. This difference confronted the court
in the cases against the railroads, and was elaborately con-
sidered in the opinion of the court by Chief Justice Ryan.
*Att'y Gen. v. Railroad Cos.* 35 Wis. 512–523. Among other
things, he there said: "This original jurisdiction is con-
ferred and limited by the power 'to issue writs of *habeas
corpus, mandamus,* injunction, *quo warranto, certiorari,* and
other original and remedial writs, and to hear and deter-
mine the same.' [Sec. 3, art. VII, Const.] The court has
many time exercised original jurisdiction in cases of *habeas
corpus, mandamus, quo warranto,* and *certiorari.* This is
the first time it has been called upon to assert original ju-
risdiction of injunction." Then, after pointing out the dis-
tinction mentioned, and the inaccuracy in the language of
certain former opinions of this court by failing to observe
it, he said:

"All the other writs of the group are common-law writs.
The writ of injunction, when the constitution was adopted,
was exclusively an equitable writ, used only by courts of
chancery. As such it was given to this court, implying
and carrying with it equitable jurisdiction to employ it. It
is therefore plain that the original jurisdiction of this court
is both legal and equitable, within certain limits; legal, for
the use of the common-law writs; equitable, for the use of
the chancery writ. The use of the former must be according
to the course of common-law courts; the use of the latter ac-

cording to the course of courts of equity; in each case subject to statutory modifications of the *practice, which do not impair the jurisdiction granted.* The common-law writs, as already observed, imply and define the jurisdiction appurtenant to them as jurisdictional writs. It is otherwise with the writ of injunction. Equity has no jurisdictional writs. By the course of courts of equity the jurisdiction must precede the writ. And although the writ is the end of the equitable jurisdiction implied, the scope of the jurisdiction must be sought mainly outside of the writ itself. It can issue only after bill or information filed. And the question still remains, What is the original equitable jurisdiction conferred on the court of bills or informations dependent on the use of the writ?

"The grant of original jurisdiction is *one entire thing,* given in *one general policy,* for *one general purpose,* though it may have many objects and many modes of execution. So it is of the appellate power. So it is of the superintending control. There are three independent and distinct grants of jurisdiction, each compact and congruous in itself; *each a uniform group of analogous remedies,* though to be exercised in several ways, by several writs, in legal and equitable proceedings, on many objects, in great variety of detail. The constitution wisely, almost necessarily, stopped with *the general grants of jurisdiction,* carefully distinguished, and left details to practice and experience."

Then, after indicating that the primary and controlling object of the framers of the constitution in giving this court "original jurisdiction over great public interests" was "for greater security," and "for the better and prompter and more authoritative protection of public interests," he said:

"And, plainly recognizing the intention of the constitution to vest in this court *one jurisdiction,* by several writs, to be put to several uses, for *one* consistent, congruous, harmonious *purpose,* we must look at the writ of injunction *in*

*the light of that purpose,* and seek its use in the kindred uses
of the other writs associated with it. *Noscitur a sociis* is an
old and safe rule of construction, . . . peculiarly applica-
cable to this consideration. . . . Here are several writs of
defined and certain application classed with one of vague
import. We are to be guided in the application of the un-
certain by its certain associates. The joinder of the doubt-
ful writ with the defined writs operates to interpret and
restrict its use, so as to be accepted in the sense of its associ-
ates; so that it and they may harmonize in their use for
the common purpose for which it is manifest that they
were all given. And thus, in this use and for this purpose,
the constitution puts the writ of injunction to prerogative
uses, and makes it a *quasi* prerogative writ."

He then contrasted injunction and *mandamus,* and said:
" The latter commands, the former forbids: Where there
is nonfeasance, *mandamus* compels duty. Where there is
malfeasance, injunction restrains wrong. And so near are
the objects of the two writs, that there is sometimes doubt
which is the proper one; injunction is frequently manda-
tory, and *mandamus* sometimes operates restraint. . . .
And it is very safe to assume that the constitution gives
injunction to restrain excess in the same class of cases as
it gives *mandamus* to supply defect; the use of the one
writ or the other in each case turning solely on the acci-
dent of over-action or shortcoming of the defendant. And
it may be that where defect and excess meet in a single
case, the court might meet both, in its discretion, by one
of the writs, without being driven to send out both, tied
together with red tape, for a single purpose. . . .
The prerogative writs proper can issue only at the suit of
the state *or* the attorney general in the right of the state;
*and so it must be with the writ of injunction,* in its use as a
*quasi* prerogative writ. *All* may go on the relation of a
private *person,* and may involve private right."

The "one entire thing"—the "one general policy"—
the "one general purpose" to be accomplished through the
"one jurisdiction" by the five several writs grouped to-
gether in one clause of the constitution, as mentioned by
the learned chief justice, manifestly has reference to "ju-
dicial questions affecting the sovereignty of the state, its
franchises or prerogatives, or the liberty of its people;"
for it is only of such, as therein indicated, that this court
takes original jurisdiction at all. The irresistible logic of
the opinion is to the effect that the power to thus issue the
five writs thus grouped together, for the one purpose named,
was by the clause of the constitution quoted vested in this
court absolutely and unconditionally, and is in no way de-
pendent upon the volition of the attorney general or any
other official. This is confirmed by what he said in *State
ex rel. Wood v. Baker*, 38 Wis. 71, quoted above, to the
effect that, while the legislature might regulate the mode
of procedure in such cases, they could not defeat nor abridge
the jurisdiction itself; that the appearance in the case by
the attorney general, or his consent, was a mere matter of
form and not of substance, and hence could be supplied
upon the hearing *nunc pro tunc*. Indeed, it would be a
solecism to hold, as this court frequently has held in sev-
eral of the cases cited, to the effect that the attorney gen-
eral has no right or power to commence such an action,
much less to prosecute it, without first obtaining leave
from this court, and then hold that this court has no power
to take jurisdiction in any such case without first obtain-
ing the permission of the attorney general. This court
cannot play fast and loose with the subject of jurisdiction.
It either has it absolutely whenever a proper cause is pre-
sented, or else it has not got it at all. If it has jurisdiction
in such a cause, it is because it has been conferred on the
court by the people in their sovereign capacity, in the
clause of the organic law quoted. If such jurisdiction is

thereby vested in the court,— as must be conceded by all,— then it would seem to be idle to deny the jurisdiction in such action merely because the attorney general has refused to co-operate or consent.

In line with the opinions of Chief Justice RYAN, mentioned, Mr. Justice PINNEY, in the recent apportionment case, among other things, said: "It would be unprofitable to cite the numerous instances of the exercise of the original jurisdiction of the court in the cases against different administrative officers of the state and county and other officers, relating to the performance of their merely ministerial duties. The cases cited are of both classes,— of *mandamus* to compel action, and of injunction to restrain it. . . . It has not been contended, nor can it be maintained, that either of these writs can go to control or restrain any public officer in the exercise of a political or discretionary power." *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 493. "Inasmuch as the use of the writ of injunction in the exercise of the original jurisdiction of this court is *correlative* with the writ of *mandamus*, the former issuing to restrain where the latter compels action, it is plain that this case, as against the respondent, is a proper one for an injunction to restrain unauthorized action by him in a matter where his duties are clearly ministerial and affect the sovereignty, rights, and franchises of the state, and the liberties of the people." 81 Wis. 504.

In Colorado, under a constitutional provision similar to ours, and in a *mandamus* case, where the court approvingly cites several cases from this court, it is said: "Cases of which this court should take original cognizance, directly involving, as in general they must, questions of public right, should be brought in the name of the people. The state or the public being the main party in interest, although individual advantage may be gained, the person instituting the proceeding should appear as relator. It is

The State ex rel. Lamb vs. Cunningham, Secretary of State.

also eminently fitting that such causes be inaugurated before this court by the attorney general, or with his consent, *or*, at least, that the refusal of that officer to act be shown.    But we do not declare such consent or refusal absolutely necessary.    If the main object of the proceedings is to vindicate a public right, to protect the interest of the state in its sovereign character, to prevent the illegal use of a public franchise as against the people generally, or a considerable portion thereof, or if it be to subserve the public interest in any of the other matters heretofore men tioned, a citizen interested could probably institute the proceeding in the name of the people without consulting the attorney general."    *Wheeler v. Northern C. I. Co.* 9 Colo. 248.    Substantially the same view of the question is taken by the supreme court of South Dakota, where the same constitutional provision is in force.    *Everitt v. Board of County Comm'rs*, 47 N. W. Rep. (So. Dak.), 298, and cases there cited    A similar clause in the Michigan constitution (sec. 3, art. VI) omits the word "injunction;" and yet in the recent case under the apportionment of that state a private citizen was the relator, and the attorney general appeared for the secretary of state, and it was held that the action was properly brought, even without asking the consent of the attorney general; and it was held that the conduct of the secretary in giving notices of election could be rightfully restrained by *mandamus.*    *Giddings v. Blacker,* 52 N. W. Rep. (Mich.), 944.

We have not examined, but it seemed to be conceded on the argument that none of the earlier constitutions contained a provision like the clause in question.    It is true, counsel cite English cases to the effect that an action for a nuisance or other matter affecting the people generally the same as the complainant, could not be maintained except by and in the name of the attorney general.    *Baines v. Baker,* 1 Amb. 158; *Strickland v. Weldon,* L. R. 28 Ch. Div. 426.

But the attorney general in England occupies a very different position than an attorney general in a government like ours. He is appointed by patent authorizing him to hold office during the pleasure of the crown; and he is required, with the aid of others, to manage all legal affairs and suits in which the crown is interested. " He is a necessary party to all proceedings affecting the crown, and has extensive powers of control in matters relating to charities, lunatics' estates, criminal prosecutions, etc." 3 Ency. Brit. 63. In all such matters he acts as the representative and agent of the crown; and, as its servant, he has for centuries enjoyed high prerogative rights. But the office is not as ancient as that of Lord High Chancellor, whose supremacy as a separate judicial officer and as keeper of the great seal and the king's conscience became established 200 years before we read of any attorney general. He enjoys high prerogative rights as well as judicial functions. As chancellor, he has for centuries prescribed his own pleadings, his own practice, and his own writs,— including injunction, *habeas corpus*, prohibition, and *ne exeat;* and during the same time he has been a great state officer, taking official rank as the highest civil subject outside of the royal family and the archbishop of Canterbury, a cabinet minister, who habitually secured the sign manual of the king,— a member of the privy council, and the presiding officer in the House of Lords.

Perhaps there is no better illustration of the English theory of a judiciary dependent, not only upon the will of Parliament, but also upon the will of the crown, as expressed through his Lord High Chancellor and attorney general, than what occurred in respect to the case of *Colt v. Bishop of Coventry*, Hob. 140, case 193, tried during the reign of James I. The action involved a mere civil right between private parties in a court of law, but in arguing the case one of the counsel had occasion to deny the power of the king to grant ecclesiastical preferments to be held

with a bishopric. The bishop of Winchester, happening to be present, complained to the king, who thereupon consulted his attorney general, Francis Bacon, and "he mentioned a power which, according to the many precedents, the king possessed, of prohibiting the hearing of any cause in which his prerogative was concerned, *rege inconsulto*,— *i. e.*, until he should intimate his pleasure on the matter to the judges;" and it was thereupon resolved that a prohibition should issue, and it did accordingly. But the court proceeded with the trial and entered judgment. Thereupon the king summoned the judges to appear before him and his Lord Chancellor and attorney general at Whitehall. Upon their appearance, the king in rage condemned their conduct; whereupon the judges, including Lord Chief Justice COKE, fell upon their knees and prayed for pardon. The king, turning, not to his attorney general, but to his Lord Chancellor, or the superior officer, said: "I require you, *my* Lord Chancellor [ELLESMERE], to declare whether I, that am king, or the judges, best understand *my* prerogative, the law, and the oath of a judge." Thereupon the Lord Chancellor said to the king: "With all humility, your majesty will best be advised in this matter by *your* majesty's counsel, learned in the law, now standing before you." Bacon responded to the effect that it was for the king, and not for the court, to declare his prerogatives. 1 Campb. Ch. Just. pp. 290–293. Of course, in later years no such interference would be allowed, even in England.

It might be interesting to inquire whether the higher rank of the Lord Chancellor in matters prerogative did not give him the discretionary right to modify and change the forms of petitions, pleadings, and writs in his own court, which had been prescribed by himself or his predecessors, without the consent, or even against the protest, of the attorney general; but it is unnecessary. Wisely, governmental powers in this country are divided between three

separate, independent, and co-ordinate departments, each with powers circumscribed and limited by fixed constitutional provisions, ordained and established by the people themselves in their sovereign capacity; and hence no such despotic interference is permissible.

It was suggested· on the argument by the learned counsel for the defendant that this court possessed the combined powers of the court of King's Bench and the court of equity presided over by the Lord High Chancellor. But this court has repeatedly disclaimed for itself and for all subordinate tribunals in the state any and all prerogative powers exercised by the Chancellor as keeper of the ·great seal and as the representative of the king, except in so far as the same may be incidentally connected with powers and jurisdiction which are strictly judicial and conferred upon the judiciary by the constitution itself. *Ruth v. Oberbrunner,* 40 Wis. 238; *Heiss v. Murphey,* 40 Wis. 276; *Dodge v. Williams,* 46 Wis. 70; *Webster v. Morris,* 66 Wis. 391; *Estate of Hoffen,* 70 Wis. 522; *Will of Fuller,* 75 Wis. 431. The same may be said of every other officer of the state, including the attorney general.

The constitution provides that " the *powers, duties,* and compensation of the treasurer and *attorney general* shall be *prescribed by law."* Sec. 3, art. VI. The statute provides that it shall be his duty to appear. for the state and prosecute or defend all actions and proceedings, civil or criminal, in the supreme court, in which the state shall be interested or a party, and all such civil cases as may be sent or remanded by that court ·to any circuit court; " *and whenever requested* by the governor or either branch of the legislature, to appear for the state, and prosecute or defend in any court or before any officer any cause or matter, civil or criminal, in which the state or the people thereof may be in any wise interested." He is also required ·" to perform all other duties imposed upon him by law." Sec.

The State ex rel. Lamb vs. Cunningham, Secretary of State.

163, R. S.  There are also several specific duties and powers imposed upon him by the statute, not material here.  It will be observed that his duties in this court are thus prescribed directly, while in other courts and before other officers he is required to act "whenever requested by the governor or either branch of the legislature."  It was suggested that the clause of the statute quoted gave to the governor a sort of prerogative control over the conduct of the attorney general; but manifestly such control could not be exercised in opposition to the duties imposed upon the attorney general by the legislature.  Besides, the purpose of the clause of the statute quoted was to impose otherwise indefinable duties upon the attorney general, and not to enlarge the powers of the governor.  Whatever prerogative powers the governor may have, they can only be such as are incident to his office and vested in him by the constitution.  All prerogative powers not authorized by constitutional provision are held in reserve by the people themselves.

We must hold that the refusal of the attorney general to bring or consent to the bringing of this suit did not prevent this court from rightfully taking jurisdiction of the same upon the relation of a private citizen in the name of the state.  This ruling relieves any attorney general from the charge of preventing a suit for an alleged invasion of the sovereignty of the state or the franchises and liberties of its people.  The present attorney general certainly has the right to exercise the judgment and discretion vested in him by law in the prosecution of suits in this court as well as other courts.

2. It is contended that this is a mere "political action, . . . to effect a political object," and therefore cannot be maintained.  We may not understand what is here meant by a "political action."  We readily perceive that the determination of an action may have a political effect, and in

that sense may effect a political object; but that would not necessarily make the question determined a political, instead of a judicial, question. The determination by the court of the validity of an act of the legislature in organizing a county, town, or municipality, or establishing a new form of town and county government, would undoubtedly have a political effect; but no lawyer, at this date, would contend that the question determined was therefore political and not judicial. In *Att'y Gen. ex rel. Bashford v. Barstow*, 4 Wis. 567, the late Senator Carpenter contended with much learning and ability that the question involved was purely political, but the court held that it was strictly a judicial question; and the learned counsel for this defendant, with his usual candor, concedes that the court was right; and yet no one will question but what the decision had a political effect. The same was true of the recent case of *Boyd v. Nebraska ex rel. Thayer*, 143 U. S. 135. President John Adams, in the last days of his administration, appointed Marbury to an office, and caused his commission to be made out, signed, sealed, and authenticated by the then secretary of state, but the same was not delivered when the administration expired, and the new secretary, on taking possession of the office, refused to make such delivery. Marbury thereupon applied to the supreme court of the United States for a *mandamus* to compel such delivery; and it was contended, as it is here, that the question of such delivery was a political matter for the sole determination of the president and his secretary, and in no sense judicial; and although the court held that it had no original jurisdiction in the case, yet MARSHALL, C. J., in their behalf, declared, in effect, that the question presented was purely judicial, and that the ministerial duty of delivering such commission might be enforced in the inferior court; and the same principle has since been repeatedly

sanctioned by the same court. *Marbury v. Madison*, 1 Cranch, 137.

Counsel for the defendant cites that portion of the opinion of the great chief justice in which he disclaims any right in the court to interfere with any of the discretionary powers vested in the executive and his subordinates; and then asks us to consider the language employed, with the word "legislature" put in the place of "executive." We cheerfully do so. In fact, we have already, in the recent apportionment case, disclaimed any and all right to interfere with any of the discretionary powers of the legislature or of any state officer. Mr. Justice ORTON, in that case, speaking for the whole court, said: "But it is sufficient that these questions are judicial, and not legislative. The legislature that passed the act is not assailed by this proceeding, nor is the constitutional province of that equal and co-ordinate department of the government invaded. The law itself is the only object of judicial inquiry, and its constitutionality is the only question to be decided." *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 484. That was done because in that case, as in this, a learned and able member of the bar contended that the question presented was political and not judicial; but, after very careful consideration, we unanimously determined that the question presented was strictly judicial, and in no sense political.

However unpleasant it may be to be again so soon confronted with the same questions, yet the duty cannot be avoided. In the language of MARSHALL, C. J., "those who fill the judicial department have no discretion in selecting the subjects to be brought before them." *Worcester v. Georgia*, 6 Pet. 541. So, whatever course other officials may pursue, this court is under a constitutional mandate to proceed in the spirit of the oath which each member has taken, and perform its duty, which was perhaps never more

aptly and tersely expressed than by MARSHALL, C. J., when he said: " Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and when that is discerned it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, *in other words, to the will of the law.*" *Osborn v. Bank of U. S.* 9 Wheat. 866.

In the case at bar the will of the law is the will of the people of the state, as expressed in the organic law of the state. In the last judicial utterance of Chief Justice TANEY he said: "Any legislation by Congress beyond the limits of the power delegated would be trespassing upon the rights of the states *or the people*, and would not be the supreme law of the land, but null and void; and it would be the duty of the courts to declare it so. For whether an act of Congress is within the limits of its delegated power or not is a *judicial question*, to be decided by the courts." *Gordon v. U. S.* 117 U. S. 705. As already indicated, the state government is divided by the constitution into three separate, independent, and *co-ordinate* departments,— legislative, executive, and judicial. The legislature necessarily precedes each of the others in the making of the laws. The executive department is co-ordinate with it in carrying the laws so made into execution. The judicial department is co-ordinate with both, in that it is required to construe and determine the validity of such laws and such official action. By each of the three departments keeping strictly within the scope of the powers conferred upon it by the constitution, harmony will prevail and the government will be respected. Certainly this court will now, as here-

tofore, scrupulously refrain from exercising any doubtful power; much less transcending the limit of its powers.

3. In granting the motion to strike out the demurrer to the complaint as frivolous, and for judgment, leave was given to the defendant to present for the consideration of the court an answer upon the merits to the complaint. Such answer has been received and carefully considered. It admits all the material allegations of fact alleged in the complaint. It consists largely of a repetition of statements and suggestions made by counsel upon the argument of the demurrer and motions, and duly considered in disposing of them. Among other things, it alleges, in effect, that the legislature had the discretionary power to apportion and redistrict the state anew as they did; that in doing so the legislature had given weight and effect to many various considerations, such as that the census of 1890 was inaccurate and did not by several thousand give to the counties of Chippewa, Florence, Forest, Oneida, Langlade, Price, and Taylor the population to which they were respectively entitled; that those several counties were rapidly increasing in population, while such counties as Adams, Waushara, Green Lake, and Marquette were making but little, if any, increase in population; that the fourth senate district of Milwaukee, with only 30,732 inhabitants, was between the Milwaukee river and the lake shore, extending northerly; that it was more or less distinguished from the residue of the city by the nature of its population and the character of its business interests; that the assessed valuation of the property therein exceeds the average of the other senate districts in that city by nearly $10,000,000; that the inequalities of population in the several senate and assembly districts, in the act in question, were not much different than the proposed bill not adopted, nor the several apportionment bills from 1852 to 1887, inclusive.

None of the considerations so alleged are among the re-

quirements prescribed in the constitution. In the recent case, Mr. Justice PINNEY, in part quoting from authorities, among other things, said: "If the act done by the state *is legal*, is not in violation of the constitution, it is quite out of the power of any court to inquire what was the intention of those who enacted the law. . . . The rule is general, with reference to the enactment of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country or existing legislation. *The motives* of the legislators, considered as the purposes they had in view, *will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactment;* and we must not suppose the legislature to have acted improperly, unadvisedly, or from any other than public motives, under any circumstances, *when acting within the limits of its authority."* State ex rel. Att'y Gen. v. Cunningham, 81 Wis. 509. In other words, in so far as the legislature keeps within the limits of its powers, the motives of its members cannot be inquired into, and its discretion is not a subject for review in the courts; but whenever, and to the extent that, the legislature transcends its powers, it is conclusively presumed that it intended to so transcend the same, and hence parol evidence of good motives or other considerations cannot be allowed to obviate the effect of such unlawful intent.

In the same connection he further said: "An issue of fact cannot be framed and tried by a jury or otherwise with a view of determining by its results the validity of an act of the legislature, but the court is to be confined to the matters of which it may take judicial notice; for otherwise a jury might find on the issue one way to-day, and another way to-morrow, and this would beget a distressing condi-

tion of uncertainty. . . .   It seems to be well established
that courts will take judicial notice of a census, whether
taken under the authority of the state or United States.
.   .   .   The apportionment is to be 'according to the num-
ber of inhabitants,' and. made *at the next session after* the
state or United States enumeration; *and the enumeration
is evidently intended as the basis of apportionment.*   The
court will take judicial knowledge of the location, general
boundaries, and the juxtaposition of the several counties,
towns, and wards mentioned in the act in question, and of
matters of common knowledge." *State ex rel. Att'y Gen. v.
Cunningham,* 81 Wis. 510.   These propositions are there
supported by the citation of numerous authorities.   See,
also, *Prieger v. Exchange Mut. Ins. Co.* 6 Wis. 89; *Swain
v. Comstock,* 18 Wis. 463; *Woodward v. C. & N. W. R. Co.*
21 Wis. 309; *Saukville v. State,* 69 Wis. 178.

Thus it is very obvious, under the rulings of this court
in the previous case, that it is not permissible for the de-
fendant here to allege and prove that in making the last
apportionment the legislature acted upon the theory that
the counties of Chippewa, Florence, Forest, Oneida, Lang-
lade, Price, and Taylor contained 12,777 more inhabitants
than appears from the census of 1890, for to do so would
open the door on the other side to prove that the other
counties of the state, or some of them, contained less in-
habitants than appears from the census.   Besides, if proved,
it would only show that the legislature purposely disre-
garded the standard of population thus conclusively fixed
by the constitution, and based their action upon other com-
putations, estimates, or considerations.   The same may, in
substance, be said in relation to that part of the proposed
answer to the effect that the legislature was induced to
make the fourth senate district as they did by reason of
the excessive wealth therein, and the nature and character
of its population and business interests.   But, as we shall

in another part of this opinion undertake to show, such considerations cannot justify a disregard of the standards of population fixed in the constitution, in making a senate district out of only 30,732 inhabitants, which is 20,385 less than the unit, and considerably less than one half of either the 9th, the 17th, or the 31st senate district. For the reasons thus substantially stated in the former case, we have rejected the proposed answer.

4. This does not exclude from consideration the several former apportionment acts from 1852 to 1887 inclusive, in so far as they may have any legitimate bearing. In fact, they were freely used on the argument of the demurrer and motions by counsel for the defendant, without any objection. In the former case it was strenuously contended that the constitutional provision requiring assembly districts to be bounded by county, town, or ward lines did not prevent the legislature from crossing county lines in the formation of such districts; and it has been said that such views have been entertained by some men especially learned in grammar and philology. To meet such contention, and on the theory that such constitutional requirement might be regarded as ambiguous and doubtful, Mr. Justice PINNEY traced the history of the provision (81 Wis. 512–515); and the present chief justice, for the same purpose, considered the former apportionment acts (81 Wis. 523). If such provision of the constitution was thus ambiguous and doubtful, then such history and former apportionments were entitled to their proper weight in the construction given. If, on the contrary, such provision was not ambiguous nor doubtful, then such history and former apportionments were irrelevant, and without any legal significance in a court of law. This must be so, because it is a well-established rule, recognized by all courts, and applicable to constitutions as well as statutes, that where the language of the instrument is plain and unambiguous,

whether it be expressed in general or limited terms, the framers thereof should be held to have intended what they have plainly expressed; and consequently no room is left for construction. Cooley, Const. Lim. (6th ed.), 69. It is there said by the learned author that "the meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when the court has occasion to pass upon it. The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it." Said MARSHALL, C. J.: "It would be dangerous in the extreme to infer from extrinsic circumstances that a case for which the words of an instrument expressly provide shall be exempted from its operation." *Sturges v. Crowninshield*, 4 Wheat. 204; *Hanson v. Eichstaedt*, 69 Wis. 546, and cases there cited. The rule is very tersely stated in *Pike Co. v. Rowland*, 94 Pa. St. 249, where it is said: "Neither the debates nor supposed views of the people, nor the *dictum* of this court, nor all combined, can set aside the plain meaning of a constitutional provision; but if the sense of a clause be doubtful, the contemporaneous understanding is material."

"If the words convey a definite meaning, which involves no absurdity nor any contradiction of other parts of the instrument, then that meaning apparent on the face of the instrument must be accepted; and neither the courts nor the legislature have the right to add to it or take from it." *Lake Co. v. Rollins*, 130 U. S. 670; *State ex rel. Weiss v. District Board*, 76 Wis. 208, 209. Since a constitution is for the very purpose of preventing any enactment contrary to its provisions, it is very certain that the meaning of language therein which is plain and unambiguous can never be perverted, much less destroyed, by long-continued infringement. Assuming, therefore, for the purposes of this case, that the inequality of representation under the last apportionment act is no greater than under former appor-

tionment acts, still the fact is irrelevant and immaterial to
the consideration of this case, unless on examination it is
found that the language of the constitution securing such
equality is ambiguous and doubtful, and long-continued
legislative construction has been given to it.

5. This brings us to the consideration of the validity of
the act of July 2, 1892. If this opinion, which has thus
far been devoted to preliminary considerations, is unusu-
ally long, it is because the defense in this case has been al-
most wholly devoted to such considerations. The subject
of inequality in representation was ably argued and care-
fully considered in the former case. Mr. Justice ORTON,
giving the leading opinion in that case, and speaking for
the whole court, among other things said: " But, again,
this apportionment acts violates and destroys one of the
highest and most sacred rights and privileges of the people
of this state, guarantied to them by the Ordinance of 1787
and the constitution,' *and that is ' equal representation in the
legislature.'* This also is a matter of the highest public in-
terest and concern to give this court jurisdiction in this
case. . . . It is proper to say that *perfect exactness* in
the apportionment according to the number of inhabitants
is neither required nor possible. But there should be *as.
close an approximation to exactness as possible, and this is
the utmost limit for the exercise of legislative discretion.* If,
as in this case, there is such a wide and bold departure
from this constitutional rule that it cannot possibly be
justified by the exercise of any judgment or discretion and
that evinces an intention on the part of the legislature to
utterly ignore and disregard the rule of the constitution in
order to promote some other object than a constitutional
apportionment, then the conclusion is inevitable that the
legislature did not use any judgment or discretion what-
ever. The above disparity in the number of inhabitants in
the legislative districts is so great that it cannot be over-

looked as mere careless discrepancies or slight errors in calculation. The differences are too material, great, and glaring, and deprive too many of the people of the state of all representation in the legislature, to be allowed to pass as mere errors of judgment. They bear upon their face the intrinsic evidence that no judgment or discretion was exercised, and that they were made intentionally and wilfully for some improper purpose, or for some private end, foreign to constitutional duty and obligation. It is not an ' apportionment,' in any sense of the word. It is a direct and palpable violation of the constitution." *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 483, 484.

In the same case, and after referring to the clause of the Ordinance of 1787, giving to the inhabitants the benefits of proportionate representation in the legislature, and the organic act of the territory of Wisconsin providing for an apportionment that should be " *as nearly equal as practicable*," Mr. Justice PINNEY said: " Though obsolete, these acts may be properly regarded as *in pari materia*, and helpful and of historical value in construing secs. 3, 4, and 5 of art. IV of the constitution, which came in to take the place of the provisions briefly quoted." Then, after referring to the language of these constitutional provisions, he further said: " Looking at the scope of these limitations, it is obvious that it was intended to secure in the future that which had been adopted and secured and enjoyed almost from the origin of popular representative government in this country to the time the constitution was adopted, ' proportionate representation,' and apportionment ' *as nearly equal as practicable* among the several counties for the election of members ' of the legislature, as it had existed in Wisconsin since 1836. The provision of sec. 3 for an apportionment ' according to the number of inhabitants' is the exact equivalent of the provisions of the Ordinance of 1787, of a ' proportionate representation of the people in

the legislature.'" And then, after referring to the veto by Gov. Dewey of the first apportionment bill passed, as not being according to the number of inhabitants, and therefore unconstitutional, and other matters, he further said: "The very great disproportion in the number of inhabitants in certain assembly districts mentioned in the opinion of the chief justice *must*, it seems to me, *be regarded as in violation* of the mandate of the constitution to apportion members of the assembly *according to inhabitants.* There is, no doubt, a wide distinction between the exercise of a fair, just, and necessary discretion within the rules of constitutional apportionment, and a gross departure and manifest abandonment and defiance of them; between discretion within certain limits and for certain ends, and an open, obvious, and palpable violation of them." *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 510–512, 518.

The opinion of the chief justice is devoted to a different question, but in speaking of dividing counties entitled to two or more assemblymen into assembly districts he said: "In making such division, the rules of compactness *and numerical equality of population, so far as practicable, are* also imposed upon the legislature by the constitution. These latter requirements are largely modified by other constitutional rules, especially the rule which prohibits the dismemberment of towns and wards." *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 530. And again: "They [the senate districts] *must also be as nearly equal in population as other constitutional requirements will permit.*" 81 Wis. 531.

Thus Mr. Justice ORTON, in giving the leading opinion of the court in the former case, declared the act *unconstitutional* and void, because the legislature had not apportioned and districted anew the members of the senate and assembly according to the number of inhabitants; and that opinion was supplemented by the other opinions therein

filed. That decision is here reaffirmed as the law of the state. The requirement that assembly districts must be as nearly equal in population as the other constitutional provisions will permit is just as applicable to two or more assembly districts in a single county as to an assembly district composed of two or more counties. While the act, here in question in the main conforms to those requirements of the constitution which *prevent equality of representation*, yet it almost wholly disregards the only constitutional requirement particularly *designed to secure such equality as near as practicable*. Hence we find one assembly district with only 8,626 inhabitants, while another contains 25,111; and one senate district with only 30,732 inhabitants, while another contains 65,952; and there are numerous other irregularities, though less glaring, yet no less repugnant to the constitution, running through the whole act. No attempt has been made to justify these palpable and unnecessary inequalities of representation upon any constitutional basis, save only that of legislative discretion.

Beyond question, the enactment of an apportionment law is an exercise of legislative power, and hence the power to make the same is vested in the senate and assembly. Whatever may have been inferred from what has been said, we believe no lawyer has contended at the bar that such supposed legislative discretion is absolute and unlimited. Had the framers of the constitution intended to give to the legislature absolute and unlimited power in the making of such apportionments, they would simply have required them from time to time to "apportion and district anew the members of the senate and assembly," and stopped right there, or have said nothing on the subject. This court has repeatedly sanctioned the proposition that our state constitution is not so much a grant as a limitation of powers; and hence that the state legislature has authority

to exercise any and all legislative powers not delegated to the federal government, nor expressly or by necessary implication prohibited by the national or state constitution. *State ex rel. Graef v. Forest Co.* 74 Wis. 615, and cases there cited. Had the constitution, therefore, remained silent as to the number of senators and assemblymen, the census, the apportionment, and the formation of senate and assembly districts, it is quite obvious that the legislature would have possessed the discretionary powers suggested. It was because the framers of the constitution were unwilling to vest such discretionary and unlimited powers in the legislature that they prescribed specific methods, restrictions, and limitations upon the exercise of such powers. Thus the constitution expressly provides that "the number of the members of the assembly shall never be less than fifty-four nor more than one hundred." Sec. 2, art. IV. Here is a discretion in the legislature, in making an apportionment or otherwise, to fix the number of assemblymen at fifty-four or one hundred, or any number between those figures; but should they attempt to fix the number at only fifty-three or less, or one hundred and one or more, it is very manifest that the enactment would be a simple nullity, for want of power to make it. So by the same section it is provided that "the senate shall consist of a number not more than one third nor less than one fourth of the number of the members of the assembly." Here is a discretion left in the legislature, but it is limited to the two fractions named, or some intermediate number, but any attempt to constitute a senate of a greater or less number than thus authorized would obviously be repugnant to the constitution and void.

Leaving out matters not relevant here, and sec. 4 of the same article, as amended, provides that "the members of the assembly shall be chosen biennially, by single districts . . . by the qualified electors of the several districts;

such districts to be bounded by county,  .  .  .  town, or ward lines, to consist of contiguous territory, and be in as compact form as practicable." It is obvious from this, that the number of districts must be the same as the number of members; that the qualified electors of each district have power to elect one member and no more; that neither a town nor a ward can be divided in the formation of an assembly district; so that each town, and the whole of it, must be in some one assembly district, and each ward, and the whole of it, must be in some one assembly district. It was determined in the former case, and is now conceded, that no county line is to be broken in the formation of any assembly district. This section also requires that each assembly district must consist of contiguous territory; that is to say, it cannot be made up of two or more pieces of detached territory. All admit that these several conditions are absolutely binding upon the legislature, and that that body has no power, much less discretion, to dispense with any one of them. It is conceded that the act in question conforms to these several requirements, but it will be observed that no one of these requirements is calculated to secure or aid in securing the equality of representation; on the contrary, their observance must necessarily to a limited extent prevent such equality of representation, so that, unless there are other provisions in the constitution calculated to secure such equality within certain limits, then there is no restriction whatever.

It will be observed that the section quoted speaks of " ward lines," but contains no other reference to cities. From this it is manifest that the framers of the constitution, even at that early day, contemplated that the necessity was likely to arise for dividing up cities by ward lines in the formation of assembly districts, and thus allow smaller factors to enter into the formation of such districts, and to that extent facilitate the equality of representation. Thus,

the primary factors of each assembly district are either towns or wards or both; and this is equally true whether the assembly district is wholly within a county, or consists of two or more counties, since each county is subdivided into towns, or towns and wards.

The section quoted also provides that each assembly district must " be in *as* compact form *as practicable*." As this clause, to a certain extent, limits legislative discretion, and at the same time and to a certain extent authorizes such discretion, it will be considered in connection with the discretionary powers of the legislature.    The constitution provides that the legislature shall, " at their first session after " the prescribed census, either by the state or the United States, " apportion and district anew the members  of the senate and assembly, *according to the number of inhabitants*, excluding Indians not taxed and soldiers and officers of the United States army and navy."    Sec. 3, art. IV. Thus it appears that the legislature must not only apportion the members of the senate and assembly " according to the number of inhabitants," but must also district anew the members of the senate and assembly " according to the number of inhabitants."    The requirement that such apportionment shall be made at the first session of the legislature after the taking of such census very clearly indicates that the census so taken is to be the basis of such apportionment; otherwise the apportionment might as well be made the year prior to the taking of such census as the first session of the legislature thereafter.    On this point Mr. Justice PINNEY, in the former case, in effect said, as will appear from a quotation herein, that the apportionment must be based upon such prior census or enumeration.    *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 510.

It is here conceded that the total population of the state according to the census of 1890 was 1,686,880; and that if it were possible to secure exact and equal representation

upon the basis of that census, the unit of representation of each assembly district would be 16,868. But, as already indicated, it is impossible to secure exact and equal representation, by reason of the constitutional hindrances mentioned; and it is because of such hindrances, and only because of such hindrances, that the legislature, under the constitution, are at liberty to depart from the equality of representation. Hence they are required by that instrument to apportion and district anew the members of the assembly " *according* to the number of inhabitants," and in doing so the districts are to " be in *as* compact form *as practicable.*" The thing thereby sought to be secured, and in fact secured, is equality of representation, in so far as it is practically attainable without violating any of the other provisions of the constitution named. And this rule is not only applicable in the formation of a district out of two or more counties, but also to the formation of two or more assembly districts in one county. In apportioning a county into two or more assembly districts there is necessarily a new unit of representation. The act in question provides for six assembly districts, each made up of one or more counties in the northern portion of the state, containing in the aggregate only 67,849 inhabitants, which is less than four times the unit, and when there is no constitutional impediment to their being grouped together into four districts. In the formation of two or more assembly districts in any one county the legislature have the discretionary power to group towns as they may see fit, and to group wards as they may see fit, or to group towns and wards as they may see fit, *provided* that in doing so they do not violate any of the provisions of the constitution mentioned.

Perhaps this may be made to appear more clearly by an illustration. Dane county contains thirty-five towns and two cities, with an aggregate population, according to the last census, of 59,578. Of these thirty-five towns, twenty-nine

contain less than 1,500 inhabitants each, and eight of these contain less than a thousand, and only one exceeds 2,000, and that contains only 2,379. The city of Stoughton contains two wards, with each less than 1,500 inhabitants. Madison has six wards, and the largest contains only 2,943 inhabitants. The act in question assigned to this county four members. It is simply impossible to apportion and district Dane county anew "according to the number of inhabitants" contained in it, and have a difference in the districts to exceed a *minor fraction* of adjoining towns, or adjoining towns and wards; but with the city of Madison all in one district, as it is in the act, there is no constitutional reason for any difference in the remaining districts to exceed 500 or at most 1,000; and yet, as apportioned under the act, there is a difference of 7,233, and this, too, is done at the expense of compactness. Similar views may be regarded as entertained in respect to a large number of counties. In consequence of the very large wards in Milwaukee,— eleven of which contain to exceed 10,000 inhabitants each, and one of which contains 22,469,— it is more difficult to approximate equality of representation, but it should be done as far as practicable under the restrictions mentioned.

Compactness, being of lesser importance, may to some extent yield in aid of securing a nearer approach to equality of representation; but in some instances, in the act in question, it is made to yield in aid of securing inequality of representation. Thus in Rock county there are three assembly districts, and there is a difference in two of them of 6,285, when it is quite obvious that minor fractions of adjoining towns do not exceed from five hundred to a thousand; and yet the smallest district is entirely surrounded by one of the other districts, thus destroying compactness in the outside district. Counsel is undoubtedly right in saying, in effect, that whether the formation of such hollow

district destroys its compactness, within the meaning of the constitution, is simply a question of fact. According to Mr. Webster, MARSHALL, C. J., once said from the bench that "a legislature may alter the law, but no power can reverse a fact." 2 Webst. Works, 334.

The constitution also requires that "the legislature shall apportion and district anew the members of the senate . . . *according to the number of inhabitants.*" Sec. 3, art. IV. The only constitutional impediment to the securing of equality of representation in such senate districts is the requirement that "senators shall be chosen by *single* districts of convenient contiguous territory, . . . *and no assembly district shall be divided* in the formation of a senate district." Sec. 5, art. IV. The proposed answer alleges that "in the formation of senate districts the legislature is given the *discretionary power* to compose them of assembly districts containing *two, three, or four* assembly districts of such numbers and situation *as to the said legislature shall seem convenient* and proper with reference to the *situation* of the inhabitants of such districts, and best for a proper representation of the interests of different parts of the state." This claim goes to the extent of authorizing the legislature, in its discretion, to form a senate district from two of the smaller or four of the larger assembly districts. Here the smallest contains only 8,626 inhabitants, and twice that number would only be 17,252, or only 213 more than one third of the senate unit; whereas the largest contains 25,111 inhabitants, and four times that number would be nearly twice the senate unit. It is true the act in question does not in any instance show such wide disparity in the population of senate districts; but to here sanction the discretionary power thus claimed is to open the door for its exercise to the maximum by any future legislature. But the present act does go in that direction to the extent of forming one senate district from *two* as-

sembly districts with an aggregate population of only 30,732, and forming another senate district from *four* assembly districts with an aggregate population of 65,952. This is a plain disregard of the constitutional mandate, which requires such apportionment to be made "according to the number of inhabitants."

The vice which seems to run through the act in question is in assuming that the only limit to the discretionary power of the legislature in making such apportionment is the major and minor fractions of such units of representation. Thus, the smallest assembly district above mentioned is only 192 above one half of the assembly unit, and the largest assembly district named above lacks only 191 of one and a half of the assembly unit; thus asserting the broad discretionary power in the formation of assembly districts of giving to the inhabitants of the one substantially three times the representative power possessed by those of the other, and in the formation of senate districts of giving to the inhabitants of the one a considerable more than double the representative power possessed by the inhabitants of the other. The constitution gives no warrant to any such fictitious standards, and will bear no such latitudinarian construction. Major and minor fractions of population in towns, wards, counties, and assembly districts are, of course, to be considered in making such apportionments, but they are only to be considered along the lines calculated to secure approximate equality in representation. The theory of major and minor fractions of the units of representation cannot excuse or justify a failure to apportion and district anew "according to the number of inhabitants" in so far as practicable, consistently with the other provisions of the constitution mentioned.

It has been said that the court should suggest a plan for such apportionment. But the court now, as heretofore,

disclaims any and all legislative functions. Besides, the people in their organic act have themselves devised a plan which is binding upon this court as well as other officials. That plan, however, can never be legitimately worked out by unknown quantities, in some occult science, along the lines of fictitious standards and extraneous considerations; but may very easily, by obeying the imperative constitutional mandate, observing its fixed standards, and resorting to the simple rules of addition, subtraction, and division. Such constitutional mandate and standards cannot be broken down or rendered inoperative on the theory of discretionary power. In speaking of a constitutional provision requiring senators to " be apportioned according to the number of inhabitants," and after mentioning the impossibility of dividing towns, SHEPLEY, J., in *Opinions of the Justices*, 18 Me. 472, 473, said: " And here also it may be said there must exist a discretion to be exercised by the legislature making an apportionment. That power which a legislative body is compelled to exercise by such a moral necessity cannot properly be considered as discretionary. If, however, it be so designated, it is a discretion like that last named, limited in the same manner, and not subject to be abused. There can be no warrant for the exercise of this kind of discretion, if it may be so called, *beyond what is required* by the case to be provided for. If the legislature has any other discretion, it is necessarily an unlimited one in practice, however it may be attempted to limit it in theory." Then, after speaking of such unlimited discretion, he further said: " It is believed that such is the legitimate and practical tendency of admitting any other discretion than that *which arises out of an absolute moral necessity.*"

" When the constitution defines how a right may be exercised, it prohibits the exercise of that right in some other way." *Morris v. Powell*, 125 Ind. 281. The rule is tersely

stated by MARSHALL, C. J., thus: "It is a rule of construction, acknowledged by all, *that the exceptions from a power mark its extent;* for it would be absurd, as well as useless, to except from a granted power that which was not granted,— that which the words of the grant could not comprehend." *Gibbons v. Ogden,* 9 Wheat. 191. And again the same chief justice said: "If it be a general rule of interpretation, to which all assent, that the exception of a particular thing from general words proves that in the opinion of the law-givers the thing excepted would be within the general clause had the exception not been made, we know of no reason why this general rule should not be as applicable to the constitution as to other instruments." *Brown v. Maryland,* 12 Wheat. 438. "In expounding the constitution," said TANEY, C. J., "every word must have its due force and appropriate meaning, for it is evident from the whole instrument that no word was unnecessarily used or needlessly added." *Holmes v. Jennison,* 14 Pet. 571; *State v. Pullman's P. C. Co.* 64 Wis. 105.

It follows that the constitution requires the legislature to apportion the state into senate and assembly districts "according to the number of inhabitants," as nearly as it can be done consistently with the other provisions of the constitution mentioned. Such constitutional requirements are plain and unambiguous, and hence are not to be regarded as abrogated by any number of legislative violations of them. If, as claimed, there has never been any such equal apportionment in the state, then there certainly has never been any legislative construction of the words quoted; for, in order to give any effect to such construction, the words construed must be ambiguous, and capable of two or more meanings, one of which the legislature has adopted. Where, however, the words are unambiguous, and the legislature has never undertaken to construe them, but simply disregarded them, their action, though

often repeated, cannot be allowed to have the effect of *pro tanto* repealing the constitution.

Judgment has already been entered in accordance with the prayer of the complaint.

WINSLOW, J. I cannot agree with my colleagues upon either of the questions which are presented in this action.

*First.* As to the jurisdiction of the court to entertain the action. The action is an action in equity for an injunction, attempted to be brought by the mere relation of a private citizen to redress a purely public wrong (if in fact there be any wrong) without the presence of the attorney general. The relator suffers no private or individual wrong different from that in which the public shares, and he assumes to maintain an action on behalf of the people, who have never placed in his hands any commission for that purpose.

That a private citizen ever possessed any such power to take upon himself, unbidden, the task of redressing the wrongs of the public by an action for injunction, at least until the rendering of this decision, I most strenuously deny. Not that a public wrong cannot be prevented by an injunction in equity. Such power has long been vigorously maintained by the courts of England and America; but it has always been maintained with equal vigor that the remedy must be invoked by the state, through the attorney general, its chosen law officer, and that a private citizen could not, of his own motion, constitute himself the self-elected champion of the people, and stride into the legal arena declaring, "I am the state," and challenge public officials to justify their acts. The authorities on the subject of the action in equity by injunction to prevent wrongs of a purely public nature were fully and exhaustively reviewed by Chief Justice RYAN in *Attorney General v. Railroad Cos.* 35 Wis. 425, and I could not hope to add anything to that

The State ex rel. Lamb vs. Cunningham, Secretary of State.

exceedingly luminous discussion of the authorities, even had I the time at my disposal to attempt the task. It is true that the exact point here under discussion was not in issue in that case, because the action was there brought by the attorney general; but the review of the authorities there made shows that the question is not open to discussion. It is there treated as a settled question. The learned chief justice says, on page 526: "We cannot state the rule better than by taking it from the excellent work of Mr. Brice, so recently given to the profession. 'Under many circumstances, the court of chancery has, on public grounds, jurisdiction to prevent corporations acting in various ways, or contrary to the intent for which they have been created. The public, however, must be represented in all applications relating to such matters, and this is done by the intervention of the attorney general. No single person, whether a member of the corporation in question or not, is able on his own account, and of his own motion, to call upon the court to interfere for his special protection.'" Again, on page 527, he quotes with approval the language of KINDERSLEY, V. C., as follows: "Whenever the interests of the public are damnified by a company established for any particular purpose by act of Parliament, acting illegally and in contravention of the powers conferred upon it, I conceive it is the function of the attorney general to protect the interests of the public by information." Also on page 543 he quotes with approval the following language of the supreme court of Pennsylvania in the case of *Buck Mountain Coal Co. v. Lehigh C. & N. Co.* 50 Pa. St. 91: "It is plain, therefore, that a private individual may not, in the absence of a special right or special authority, vindicate the public for breach of duties owing to her alone. . . . It may not be out of place to add that we have no doubt but the remedy by a bill for an injunction, sued out on the part of the commonwealth by the attorney general, would lie

The State ex rel. Lamb vs. Cunningham, Secretary of State.

against a company to compel them to observe their charter obligations." The chief justice further says, on page 529: "The jurisdiction is now clearly defined as having two branches; one on behalf of the state for public wrong, and the other on behalf of private persons for private wrong, arising from an excess or abuse of corporate franchises. Relief against public wrong is confined to informations by the attorney general."

. The language of Chief Justice Gibson of Pennsylvania in the case of *Comm. v. Burrell*, 7 Pa. St. 34, is especially happy upon this point. He says: "The commonwealth has her own chosen officer for the protection of her own rights (and the rights of the whole community are what constitute public rights or the rights of the commonwealth), and, as she has not explicitly allowed his office to be assumed by any one who may please to try his hand at the business of prosecution as self-constituted *locum tenens*, we dare not assume the power to allow it." It seems entirely clear to me that, according to the universal practice of the English and American courts of chancery, an action like the present, to prevent a purely public wrong, must be brought by information in equity, filed by the attorney general on behalf of the public. The public suffers the wrong; the public must bring the action to redress it.

But it is claimed that because by our constitution the writ of injunction has been classed with the purely prerogative common-law writs, like *mandamus, quo warranto*, etc., and has thus acquired the nature of a prerogative writ, some change has necessarily taken place in the manner of its use. Not so, however; no such change is indicated in the constitution nor in our statutes, and the very decision which settled the *status* of the writ as a *quasi* prerogative writ — *i. e., Attorney General v. Railroad Cos.* 35 Wis. 425 — contains the following apt and sensible remarks on this very question: "It is therefore plain that the original

jurisdiction of this court is both legal and equitable, within certain limits,— legal for the use of the common-law writs; equitable for the use of the chancery writ.   The use of the former must be according to the course of the common-law courts; the use of the latter, according to the course of courts of equity; in each case subject to statutory modifications of the practice, which do not impair the jurisdiction granting them."

Neither the suggestion in *State ex rel. · Wood v. Baker*, 38 Wis. 71, nor the opinion in *State ex rel. Drake v. Doyle*, 40 Wis. 175, help the relator's position in this action in the least.   These were applications for the true prerogative writs of *quo warranto* and *mandamus*, respectively, which are purely common-law writs.   As indicated by Chief Justice RYAN, their use must be according to the course of the common-law courts.   It seems to be a fact that these common-law writs were often issued by the common-law courts on relation of a private citizen to enforce a public right; but the injunction was a remedy applied only by the court of chancery according to its own rules, and one of those rules was that in matters of purely public right it must be sued out by the attorney general.   I think I can say confidently that no case or authority can be found to the contrary of this doctrine.   I am gratified also to know that my views upon this question seem to have been shared as recently as March last by my colleagues on this bench.   In the former case of *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440, Mr. Justice ORTON said, upon page 471: " As a preliminary question, it has already been decided that this case could not be brought by a private relator, because no one has any private interest in the subject matter.   The matter being exclusively *publici juris*, the case must be brought by the attorney general on his own relation, representing the whole state and the people thereof.   This is the form and title in which the case now stands in this

court, and in which it must be sustained, if at all." And Mr. Justice PINNEY, on page 487, was even more emphatic: "The suit is one instituted in this court in the name of the state by the attorney general, upon leave granted, in relation to a matter of public concern, involving the rights and liberties of the people of the state, concerning matters strictly *publici juris*, and in which no one citizen has any special or peculiar right or interest to be protected or vindicated other than that which is common to citizens in general; and in relation to which no private person can have or maintain an action, and no suit or proceeding can be maintained save in the name of the state, prosecuted by the attorney general." And Mr. Justice CASSODAY said that the decision was in full accord with his judgment. It is to be remembered, also, that in the case in which these opinions were written application was first made by a private relator for leave to bring the action, so that the remarks above quoted must have been made advisedly. My views are the same now as then upon the proposition, but the views of my associates seem to have changed.

However, if this were the only point upon which I differed with the decision of the majority of the court, I should write no opinion, but content myself with a simple dissent. But my views as to the merits of the action are totally at variance with those of my colleagues, and to that question I address myself. In the former case of *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440, it was held that the apportionment act of 1891 was invalid because it violated a positive command of the constitution, namely, the command that county lines should not be broken in the formation of assembly districts. As to the correctness of that decision I have no doubt. But that question is not before us now. The controlling question in this case is whether the law is unconstitutional because of the disparity of population between the districts formed by it. In the

case just cited it was said by Mr. Justice PINNEY, in the course of his opinion, with reference to this very question: "Whether this court can declare an act of apportionment void in such cases is a question not material to the decision of this case, and which will require further discussion and consideration, and need not be now determined." In these views I concurred.

The question thus suggested is now presented. Every law passed by the legislative branch of the government and approved by the executive is presumed to be constitutional. Every intendment is in its favor. It is not to be lightly set aside. It should be sustained, unless it is clearly in violation of the constitution; and it is frequently said that its unconstitutionality must appear beyond all reasonable doubt. These are fundamental principles. I approach the consideration of this question, therefore, feeling that the law should be sustained if possible, and this feeling is the stronger because a decision adverse to the law declares unconstitutional every previous apportionment, and brands every legislature which ever assembled at the seat of government since 1852 as merely a *de facto* legislature; for it is a fact that all previous apportionments contain greater relative differences in population than the one before us. One would naturally desire to be very sure of his ground before announcing such a conclusion.

Let us examine the constitutional provisions which are claimed to be violated by this law. The first requirement is that the apportionment shall be made according to population. This requirement was, of course, intended to secure substantial equality of representation. If it stood alone, without other requirements, the argument would be strong that practically absolute equality in the population of districts was intended. But there are other requirements, equally binding, which, to a greater or less degree, must necessarily seriously interfere with the idea of absolute

equality in districts; in fact, render it impossible. In case of assembly districts, these other requirements are (1) that no county, town, or ward line shall be broken; (2) that the districts shall consist of contiguous territory; and (3) that they shall be in as compact form as practicable. In case of senate districts, (1) that no assembly district be divided; (2) that the territory of the district be convenient and contiguous.

No argument is required to show that these additional constitutional commands render impossible anything approaching absolute numerical equality in districts. If county lines cannot be broken, great disparity in population in districts is unavoidable. Take an example. Suppose the unit of assembly representation to be 16,000. Given two counties containing respectively 39,000 and 25,000 inhabitants. The first county has two entire units and a minor fraction, so it will be entitled to but two assemblymen; the second county has one unit and a major fraction, which entitles it to two assemblymen. Thus, if these two counties be divided exactly evenly, 19,500 inhabitants will elect an assemblyman in one county while 12,500 will elect an assemblyman in the other county, but it could not be said that any rights of any citizen had been violated. So it is evident, also, that the requirement of compactness is liable to interfere seriously with numerical equality.

And in the case of senate districts it is equally evident that the constitution cannot mean absolute equality. The senate district must be composed of entire assembly districts. There are now thirty-three senate districts and one hundred assembly districts. If the assembly districts be equal, or nearly so, and three are assigned to each senate district, there will be one senate district composed of four assembly districts; and the numerical difference between this last-named district and the others would be substantially the assembly unit. Thus the very terms of the con-

stitution demonstrate the impossibility of equality in either
senate or assembly districts.

It is evident that the term "according to population"
means as near as reasonably practicable, in view of the
other requirements.    It is evident also that there must be
a latitude of action in regard to population if the require-
ment as to compactness is to have any effect.    This is cer-
tain, because if the districts are to be divided so as to give
the nearest possible approach to equality, compactness must
necessarily be disregarded.    Who, then, is to judge of what
degree of equality of numbers is reasonably practicable?
And who is to judge of the compactness which is practi-
cable?    Manifestly the legislature, upon whom the duty of
apportionment is imposed.    Here, then, is evidently a lati-
tude of action.    Here, within limits which no one can pre-
cisely define or lay down, is a discretion to be exercised,
not by this court, but by the legislature.    The very fact,
also, that the duty of apportionment is imposed on the leg-
islature, a body which in the highest degree is charged
with the exercise of judgment and discretion in its acts, is
a strong implication that discretion is intended to be exer-
cised.    If it were simply a question of addition and division,
a board of arithmeticians would answer the purpose far
better.    There is, therefore, in my judgment, a discretion
here which, with the terms of the constitution alone before
us, is evidently quite large; a discretion which any court
should hesitate long before interfering with.

I say it is evident on the face of the constitution itself
that a large discretion necessarily exists in the legislature
with reference to the matter of population, but we have
light on the subject other than that furnished by the words
of the constitution.    It is a cardinal principle of the law with
reference to the construction of statutes the meaning of
which is in any way doubtful, that contemporaneous, long-
continued, and open construction of the statute in a certain

manner by the officers or bodies charged with the duty of executing it is of great weight in judging of the proper construction, and such practical construction is often controlling. This principle has been fully recognized by this court in *Scanlan v. Childs*, 33 Wis. 663, and *Harrington v. Smith*, 28 Wis. 43. That the same principle is applicable to the construction of a constitution, which is simply the highest law of the state, is unquestionable. *Commissioners v. Miller*, 7 Kan. 479. In judging, therefore, of the latitude or discretion which the legislature is given by the constitution with regard to the population of districts, we are entitled to examine into and consider the construction which was contemporaneously placed upon these constitutional provisions. In this investigation we are peculiarly fortunate, because the same body which framed the constitution and laid down the rules of apportionment incorporated into the constitution also an apportionment of the state, which remained in force until 1852. Now, I know it will be said that the constitution makers were not bound by the constitutional requirements in making their apportionment, and that they might, if they chose, violate the rules which they laid down for the control of the legislature; and I freely grant the soundness of the proposition. But to my mind it is not within the bounds of reason nor probability to suppose that an earnest body of men, assembled for the purpose of laying the foundation of the new commonwealth, should lay down a code of fundamental rules intended to guard the rights of the citizen in his voting power for all time, and in the next breath should deliberately violate those rules, and declare that for a number of years that part of the constitution should be nullified. Nor do I find anything in the debates of the convention which indicates that the members ever thought they were making an apportionment in violation of constitutional rules. I entertain no doubt that this first apportionment

made by the framers of the constitution was intended to be made under the rules which the constitution laid down. Any other view seems to me a severe imputation upon the character of the fathers of the state. I regard it as a practical exposition of the constitution by the makers of that instrument themselves, and as such entitled to the greatest weight in judging of the extent of that undefined latitude or discretion which was intended to be allowed as to population of districts. As such, let us briefly examine it.

The population of the territory was a little more than 210,000. The number of assemblymen provided for was sixty-six, and of senators nineteen. The assembly unit of population was nearly 3,200, the senate unit 11,000. The largest assembly district was Green county, which had a population of 6,487, or more than twice the unit; and the smallest district was Calumet county, with a population of 1,060, or about one third of the unit; and between these two extremes the whole gamut of population was run through in the other districts. So the largest senate district was Waukesha county, with a population of 15,866, an excess of nearly one half the unit, and the smallest district was formed of Crawford, Chippewa, St. Croix, and La Pointe counties, with a population of 3,450, or about one third the unit; and between these extremes ranged the other districts. Again, counties were not given their proportionate number of members. Thus, Racine county, with a population of 19,539, and entitled clearly to six members, received but five, while Rock county, with a population of 14,729, also received five. Again, where counties were awarded more than one assemblyman, the division of the county was not always made in accordance with the county unit of population. An example of this occurs in Milwaukee county, where the country towns are divided into three

assembly districts, with populations, respectively, of 2,156, 2,948, and 3,620. By an obvious rearrangement, whereby compactness is not sacrificed, the districts might have been made 2,784, 2,807, and 3,133. Other instances could undoubtedly be found, but I forbear. I have cited enough to show that the constitution makers evidently considered that there was a wide latitude or discretion allowable as to population.

It was natural that when the constitutional convention had thus set the example and given a practical construction to the instrument, the legislature should follow the path so marked out, and so we find the fact to be. The first legislative apportionment was made in 1852; the next in 1856; and they have been made every five years since that time. In 1852 the units of representation were nearly the same, and the assembly districts varied in population from 963 to 8,566, the senate districts from 4,104 to 19,138, while many counties received less than the number of assemblymen which the population entitled them to. In 1856 the assembly districts ran from 2,423 to 9,272, the unit being 5,521; and the senate districts ran from 7,558 to 34,540, the unit being 18,403. In 1861 the assembly districts ran from 3,119 to 15,682, the unit being 7,758; and the senate districts ran from 13,170 to 34,154, the unit being 23,511. In 1866 the assembly districts ran from 5,199 to 14,841, the unit being 8,683; and the senate districts ran from 12,667 to 42,029, the unit being 26,313. In 1871 the assembly districts ran from 5,855 to 23,611, the unit being 10,546; and the senate districts ran from 14,570 to 46,941, the unit being 31,959. It is unnecessary to follow the remaining apportionments. They are substantially like those above cited; they all show the exercise of a wide latitude as to relative population of districts; they all follow the lead of the constitutional apportionment. The present ap-

portionment divides the state far more nearly according to population than any one of the previous apportionments since the state was born.

Now, I do not wish to be misunderstood. I am not claiming that because previous legislatures have violated the constitution the legislature of 1892 may do so with impunity. I fully understand that no prescriptive right to break a constitutional command can be acquired. I am simply claiming that it is apparent that the constitution confers a discretion on the legislature as to the population of districts, a discretion whose limits are undefined, and that in considering the limits of such discretion, contemporaneous, long-continued, and unchallenged construction by the legislature is of great weight. Here we have a practical construction placed upon the constitutional requirement by the constitution makers themselves. We have also forty years of practical construction by the legislature following the constitutional construction, unchallenged until now; and I believe it should prevail. If it does prevail, then the law before us is unquestionably valid.

Considerable stress was laid upon the fact that under the act in question, where counties contained more than one assembly district, the county was not divided as nearly equally in point of population as possible. A considerable number of instances of this kind were commented upon. It was claimed that in such case a new unit should be obtained, and the districts made to conform as nearly as practicable to that new unit in population. What I have said as to the legislative discretion applies to a considerable extent upon this question. The limitations of contiguity and compactness interfere with equality of population, and the forty years practical construction is equally emphatic in its tendency to prove that no inflexible rule of this kind is laid down by the constitution. It is very evident also that it would be very undesirable in some cases to divide a county

as absolutely even as possible.   Take the case of Racine
county, for instance.   The city contains a population of
21,014 by the last census, and the country towns a popula-
tion of 15,254.   The city, by this law, was made one as-
sembly district, and the country another.   Now, here was
a disparity of nearly 6,000 between these two districts; but
is it not manifest that the county will probably be better
represented and the voters better satisfied by this arrange-
ment than by detaching wards from the city and adding
them to the country district?   Any man with any ex-
perience knows that the attaching of city wards to a
country district is apt to produce discord and dissatisfac-
tion.   The city has its peculiar interests, and the country has
its interests, and they generally conflict.   A map was pre-
sented, showing how the county could be divided into two
districts with almost exact equality of population.   By this
map the first and second wards of the city were detached
from the city and added to the country towns.   The fan-
tastic shape of the proposed district would rival that of the
original district from which it is said the word "gerry-
mander" is derived.   No one would say that any good end
could be subserved by such a carving of the city.

Now, I do not contend that these remarks apply to all
the districts of which complaint is made.   They do apply
to some extent to the Janesville district, and to the Eau
Claire district; but there are undoubtedly disparities in the
divisions of counties for which no particular reason ap-
pears on the face of the map.   With regard to such in-
stances, it is clear to me that the legislative discretion is a
wide one as to numbers; that they may consider things
such as the community of interest, facility of communica-
tion, and the general topography, the rapidity with which
population is increasing, and many other things which this
court cannot know, and with which it has nothing to do.
This court cannot take evidence as to these outside consid-

erations, but I have no doubt of the power of the legislature, in the exercise of its discretion, to consider them. Such considerations were urged in the constitutional convention in making the first apportionment, and it is clear that they were acted upon, and that variations in populations of districts were thus produced. In any event, the differences within county lines are not sufficient, it seems to me, to authorize any court, in view of our constitutional and legislative history, to set aside the law and leave the state with no apportionment.

A few general observations, and I leave the subject. I fear we are entering upon a period of judicial apportionments. This is the second law which has been attacked within a few months in this court. · After the decision on the first law, the legislature was reconvened and the present law enacted. Now this law is attacked, the court holds it void, and points out in its opinion wherein the constitution is violated. Presumably another session of the legislature will be held, and another attempt will be made to pass an apportionment law in accordance with the opinion of the court. This also may be attacked by some enterprising citizen, who steps into court with his private counsel and relates to the court the burning wrongs of some of his fellow-citizens in a far distant county, who are all unconscious of the outrages inflicted on their rights as citizens. Again the court will pass upon the questions raised, and inform the legislature wherein the law must be corrected. By the time this process has been repeated several times more, it will be a serious question whether the law finally resulting is the offspring of the legislature or of the court. Has not the legislature acted simply as the recorder of the decrees of the court? Has not its discretion vanished and been supplanted by the discretion of the court? Has not the court in fact made the law, and thus invaded the province of its co-ordinate branch of the gov-

ernment? Truly I think these queries must be answered in the affirmative, and, if so, the grave nature of this decision is apparent. The court has assumed to itself legislative power. It has practically substituted its discretion for the legislative discretion. No essay on our form of government is necessary to show that an encroachment by one branch of the government on the proper powers of one of its co-ordinate branches is a greater evil than the evil of gerrymandering. I am not by any means defending gerrymandering. I recognize it as an evil, although I am inclined to think that its bad effects are generally overestimated. I think there are very few, if any, instances where political power has been retained by the minority for any length of time by means of the gerrymander. But, however this may be, the question presented now is not whether the gerrymander is an evil, but what are the limits of the discretion which the legislature may constitutionally exercise in forming legislative districts?

This opinion has been written at intervals, amid the press of exacting and onerous judicial duties. The writer is aware that it is not a complete discussion of the questions involved in this important case, nor was it intended to be such a discussion. It was simply intended as a statement of the grounds upon which the writer feels compelled to dissent. Holding the views which are here indicated, it has seemed to me my imperative duty to place on record this earnest though unavailing protest.

See note to this case in 17 L. R. A. 145; also *People ex rel. Carter v. Rice,* 16 L. R. A. 836, and note.— REP.